## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOHN JEAN,

      Plaintiff,

    v.

BUCKNELL UNIVERSITY, *et al.*,

      Defendants.

No. 4:20-CV-01722

(Judge Brann)

## MEMORANDUM OPINION

### APRIL 16, 2021

Before this Court are three motions to compel arbitration,[1] and one motion to stay discovery pending resolution of the motions to compel.[2]  On September 22, 2020, Plaintiff John Jean commenced this suit against Bucknell University, the National Fraternity of Kappa Delta Rho ("Kappa Delta Rho"), the Kappa Delta Rho Iota Chapter (the "Iota Chapter"), and three members of the Iota Chapter at Bucknell.[3]  Jean asserts various claims arising from a fraternity event where he was allegedly hazed.[4]

These motions are now ripe for disposition; for the foregoing reasons, they are denied.

---

[1]  Doc. 14; Doc. 16; Doc. 46.
[2]  Doc. 30.
[3]  Doc. 1.  The three members are William Babcock, Dillon Duttera, and Nicholas Zanghetti.  *Id.*
[4]  *Id.*

## I.    BACKGROUND

### A.    The Hazing Incident

In fall 2020, Jean, a sophomore at Bucknell, applied to join the Iota Chapter of the Kappa Delta Rho fraternity located on Bucknell's campus.[5]  His application was accepted, and on September 8, 2020, Jean received a "bid" (invitation) to "pledge" (join) the Iota Chapter.[6]  Soon after, members of the Iota Chapter scheduled an "initiation" for that year's "pledge class" (those students who had received and accepted bids to join the fraternity).[7]  The initiation was scheduled for the night of September 10, 2020, and was referred to by some members of the Iota Chapter as the first of several "lessons."[8]  Jean was one of seven pledges invited to the initiation.[9]

At the event, the pledges were instructed to play a drinking game.[10]  To play, each would take a turn drinking from a two-liter bottle of vodka.[11]  Regardless of how much alcohol was left, the last pledge to drink was required to finish the remainder of the bottle.[12]  The purpose of the game seems to be for each pledge to drink enough from the bottle so as to prevent the last pledge from having to

---

[5]   *Id.* ¶¶ 5, 17.  Jean states that he also applied to other Bucknell fraternities, although he has not specified which ones.  Doc. 48 at 9.
[6]   Doc. 1 ¶ 18; Doc. 47 ¶ 1.
[7]   Doc. 1 ¶ 19.
[8]   *Id.*
[9]   *Id.*
[10]  *Id.* ¶ 20.
[11]  *Id.*
[12]  *Id.*

consume a disproportionately large amount.[13]  Throughout the game, members of

the Iota Chapter "screamed, chanted, and cheered," which encouraged and

pressured the pledges to drink.[14]

Jean was the third pledge to drink from the bottle, which became empty by

the fifth pledge.[15]  After finishing the game, the pledges were instructed to

continue drinking beer and hard liquor.[16]  Jean, who is 5'4" and weighs 130

pounds, became extremely inebriated.[17]  Without elaborating on the details, Jean

alleges that he was violently hazed throughout evening, and that the hazing was led

by Defendants William Babcock (the Iota Chapter president) and Dillon Duttera

(the Iota Chapter "pledge master").[18]  At some point, Jean attempted to exit the

fraternity house to return to his dorm, but was not allowed to leave.[19]

When Jean was later able to leave the fraternity house, he was confronted

outside by Defendant Nicholas Zanghetti, one of the seven Iota Chapter pledges in

Jean's pledge class.[20]  Zanghetti told Jean not to leave, and then punched him in

the face.[21]  Jean fell and hit his head on the ground.[22]  He began vomiting, and lost

---

[13]  *See id.*
[14]  *Id.* ¶ 21.
[15]  *Id.* ¶ 20.
[16]  *Id.* ¶ 22.
[17]  *Id.* ¶ 23.
[18]  *Id.* ¶¶ 25, 31-32.
[19]  *Id.* ¶ 24.
[20]  *Id.* ¶¶ 8, 26.
[21]  *Id.* ¶ 26.
[22]  *Id.* ¶ 27.

consciousness.[23]  After being transported to a nearby hospital, Jean was treated for alcohol poisoning and a head-injury/concussion (caused by Zanghetti).[24]  Jean was further treated for extensive bruising on his face, arms, torso, legs, and backside from being punched and kicked at the initiation.[25]  He also suffered cigarette burns on his feet.[26]

### B.      The Arbitration Agreement

Every student who receives a bid to join the Iota Chapter must complete a New Member Registration form on the Kappa Delta Rho website.[27]  Once the form is filled out and submitted, students are considered "new members" of Kappa Delta Rho.[28]  This form contains three sections.  The first requires new members to provide personal information including, among other things, the member's name, address, and expected year of graduation.[29]

The second requires the new member to agree to the Financial Commitment and Responsibility Agreement (the "Financial Commitment").[30]  By consenting to this provision, the new member agrees to pay various dues and fees related to his membership in Kappa Delta Rho.[31]  The Financial Commitment also requires new

---

[23]   *Id.*
[24]   *Id.* ¶¶ 29-30.
[25]   *Id.* ¶ 31.
[26]   *Id.* ¶ 32.
[27]   Doc. 46-2 ¶ 4.
[28]   *Id.* ¶ 8.
[29]   *Id.* at 7.
[30]   *Id.* at 7-8.
[31]   *Id.* at 7.

members to waive personal jurisdiction and agree to a forum-selection clause in future litigation; specifically, a member must agree that "any litigation over the enforcement or interpretation of this agreement shall be conducted" in Pennsylvania, and that he will not raise any defenses related to personal jurisdiction.[32]

The third section requires the new member to consent to the Claim and Dispute Resolution Plan (the "Plan"), which incorporates by reference the Claim and Dispute Resolution Rules (the "Rules").[33]  The Plan provides for mandatory arbitration of "any legal or equitable Claim, Dispute, demand or controversy" between a member and Kappa Delta Rho or between fraternity members (or any other parties) who have agreed to the Plan.[34]

After receiving his bid to join the Iota Chapter, Jean completed a New Member Registration form on the Kappa Delta Rho website on September 8, 2020.[35]  He filled out the required personal information in the first section, and checked boxes under the Financial Commitment and the Plan confirming his assent

---

[32]  *Id.* at 8.

[33]  *Id.* at 8-18.  Because the Plan and the Rules use the same numbering sequence, the Court will explicitly note when it is citing to the Rules (as opposed to the Plan).  *E.g.*, *id.* § 1; *id.* § 1 (Rules).

[34]  *Id.* § 1.  Though the Plan never expressly states that all covered claims are subject to mandatory arbitration, it does provide that the procedures laid out by the Plan (which detail and describe how arbitration shall be conducted) are the "exclusive, final and binding method by which Disputes are resolved."  *Id.* § 9.

[35]  Doc. 46-2 ¶ 8

to the terms of both.[36]  Underneath these boxes, Jean also typed his initials to serve

as an electronic signature.[37]

### C.    Procedural Posture

The Complaint raises claims against the defendants for hazing, negligence,

negligence per se, and assault and battery.[38]  After Jean commenced this action,

Duttera, Babcock, and the Iota Chapter moved separately to compel arbitration and

to enforce the Plan.[39]  Both Babcock and the Iota Chapter have further requested

that the Court stay discovery pending determination of the motions to compel.[40]

Jean now opposes enforcement of the Plan on various grounds; Bucknell also

contests the motions to the extent that the Court might consider requiring Bucknell

to arbitrate under the Plan as a non-signatory.[41]

## II.    LEGAL STANDARD

The Federal Arbitration Act ("FAA") provides that written arbitration

agreements "shall be valid, irrevocable, and enforceable, save upon such grounds

as exist at law or in equity for the revocation of any contract."[42]  The FAA was

enacted "in response to widespread judicial hostility to arbitration"[43] in an effort to

---

[36]  *Id.* at 8, 18.

[37]  *Id.*

[38]  Doc. 1.

[39]  Doc. 14; Doc. 16; Doc. 46.

[40]  Doc. 30; Doc. 47.

[41]  Doc. 22.  Because Bucknell's motion to dismiss has been granted, the Court will not address whether Bucknell should be compelled to participate in arbitration as a non-signatory.

[42]  9 U.S.C. § 2.

[43]  *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 232 (2013) (citations omitted).

"place arbitration agreements on an equal footing with other contracts."[44]
Accordingly, "[a] party to a valid and enforceable arbitration agreement is entitled
to a stay of federal court proceedings pending arbitration as well as an order
compelling such arbitration."[45]

But before compelling arbitration, "a court must determine that (1) a valid
agreement to arbitrate exists, and (2) the particular dispute falls within the scope of
that agreement."[46]  Because the FAA reflects a "strong federal policy in favor of
the resolution of disputes through arbitration," courts apply a general presumption
of arbitrability when considering the second prong of analysis.[47]  However, this
presumption does not apply when determining whether an arbitration agreement is
valid.[48]

In analyzing the validity of an agreement, courts "should apply ordinary
state-law principles that govern the formation of contracts."[49]  Parties may also

---

[44]   *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (citing *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006)).

[45]   *Alexander v. Anthony Int'l, L.P.*, 341 F.3d 256, 263 (3d Cir. 2003) (citations omitted).

[46]   *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009) (citations omitted); *Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005).

[47]   *Cf. Kirleis*, 560 F.3d at 160 (internal quotation marks and citations omitted) (noting that the presumption does not apply to determinations of validity); *see also AT&T Tech., Inc. v. Commc'n Workers of Am.*, 475 U.S. 643, 650 (1986) ("[T]here is a presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.  Doubts should be resolved in favor of coverage.'" (alterations in original) (internal quotation marks omitted) (quoting *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582-83 (1960))).

[48]   *Kirleis*, 560 F.3d at 160 (quoting *Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir. 2002)).

[49]   *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (citations omitted); *Aliments Krispy Kernels, Inc. v. Nichols Farms*, 851 F.3d 283, 288 (3d Cir. 2017).

avoid arbitration by invoking "[g]enerally applicable contract defenses, such as fraud, duress, or unconscionability."[50]  But to successfully do so, parties must specifically challenge the validity of the agreement to arbitrate; simply attacking the entire contract (which may contain an arbitration clause) as invalid or void is insufficient.[51]  Where a party fails to make such a challenge, the question of a contract's validity is submitted to arbitration.[52]

Additionally, "when it is clear on the face of the complaint that a validly formed and enforceable arbitration agreement exists and a party's claim is subject to that agreement," courts must apply the Federal Rule of Civil Procedure 12(b)(6) motion to dismiss standard "without discovery's delay."[53]  "But if the complaint states a claim or the parties come forward with facts that put the formation of the arbitration agreement in issue," a court may permit "limited discovery" to resolve the matter, and will "consider the question anew, using a summary judgment standard under Rule 56."[54]

The parties here agree that the Rule 56 summary-judgment standard is appropriate.  Accordingly, Jean, as the party opposing arbitration, shall be "given

---

[50] *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996) (citations omitted).

[51] *Buckeye*, 546 U.S. at 448-49.

[52] *Id.*

[53] *MZM Constr. Co., Inc. v. N.J. Bldg. Laborers Statewide Benefit Funds*, 974 F.3d 386, 406 (3d Cir. 2020) (quoting *Guidotti v. Legal Helpers Debt Resol., LLC*, 716 F.3d 764, 776 (3d Cir. 2013)).

[54] *Id.* (citing *Guidotti*, 716 F.3d at 776); *see also Kaneff v. Del. Title Loans, Inc.*, 587 F.3d 616, 620 (3d Cir. 2009) (citing *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd.*, 636 F.2d 51, 54 (3d Cir. 1980), *abrogated on other grounds by Century Indem, Co. v. Certain Underwriters at Lloyds, London*, 584 F.3d 513 (3d Cir. 2009)).

'the benefit of all reasonable doubts and inferences that may arise.'"[55]  Further,

"[i]f the party opposing arbitration can demonstrate, by means of citations to the

record, a genuine dispute as to the enforceability of the arbitration clause, a court

may then proceed summarily to a trial regarding 'the making of the arbitration

agreement or the failure, neglect, or refusal to perform the same.'"[56]

## III.   DISCUSSION

Jean contests the enforceability of the Plan on a number of grounds.

Specifically, he maintains that the Plan does not apply to his claims, that the Plan is

unconscionable, that it is void as against public policy, and that it impermissibly

bifurcates proceedings related to the alleged hazing incident because Bucknell is a

non-signatory and thus cannot be compelled to arbitrate under the Plan.  In

response, the defendants assert that the Plan is valid and enforceable.  Babcock and

Duttera further contend that all questions of arbitrability (including that of the

Plan's validity) must be decided by an arbitrator.

The Court holds first that it, not an arbitrator, shall determine whether Jean's

claims are arbitrable.  Babcock and Duttera fail to show that the Plan contains a

delegation provision mandating that arbitrability be determined by arbitration.  The

Court holds second that numerous provisions of the Plan are unconscionable.

Further, because the Plan demonstrates a "systematic effort to impose arbitration"

---

[55]   *Id.* (quoting *Park-Knit Mills*, 636 F.2d at 54).

[56]   *Somerset Consulting, LLC v. United Cap. Lenders, LLC*, 832 F. Supp. 2d 474, 482 (E.D. Pa. 2011) (quoting 9 U.S.C. § 4).

on a disadvantaged party,[57] the Court declines to sever the unconscionable provisions and instead denies the Defendants' motions to compel entirely.[58]

## A.    Arbitrability

A recurring issue in the field of arbitration is who decides, and how to determine who decides, threshold questions of arbitrability.  Questions of arbitrability are those that speak to the core issue of whether an agreement to arbitrate, once created, is enforceable.[59]  Challenges to an agreement's existence, validity, or scope thus all raise questions of arbitrability.[60]  In other words, resolving questions of arbitrability require answering whether a particular matter should be arbitrated in the first place.

Parties may agree to resolve questions of arbitrability through arbitration.[61] When this occurs, an arbitrator, not a court, will address all "gateway" challenges to arbitration, including arguments that an arbitration agreement is invalid, unconscionable, or otherwise unenforceable.[62]  A clause in an arbitration

---

[57]  *Alexander*, 341 F.3d at 271.

[58]  Since the Court finds the Plan unenforceable as unconscionable, it declines to reach Jean's arguments regarding the scope of the agreement, public policy, or the bifurcation of proceedings.

[59]  *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010).

[60]  *Id.* (noting that "whether the parties have agreed to arbitrate" or "whether their agreement covers a particular controversy" are questions of arbitrability (citations omitted)).

[61]  *Id.* (first citing *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83-85 (2002); and then citing *Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 452 (2003) (plurality)).

[62]  *Id.*

agreement purporting to delegate questions of arbitrability is sometimes referred to as a "delegation provision."[63]

Valid delegation provisions will be enforced notwithstanding the invalidity of the larger agreement to arbitrate.[64]  Consequently, where a delegation provision exists, it is vitally important for a party seeking to avoid arbitration to specifically challenge the provision's validity.[65]  For even if an arbitration agreement is wholly void and unenforceable, a valid delegation provision will nonetheless be severed and enforced, thus requiring a court to send questions of an agreement's broader enforceability to arbitration without further discussion.[66]

Boiled down, the analysis of whether a court or an arbitrator should decide the arbitrability of a matter proceeds in two steps.  First, the proponent of arbitration must show the existence of a delegation provision.  Because it is presumed that courts will decide questions of arbitrability, a delegation provision stating to the contrary must do so "clearly and unmistakably."[67]  The burden of

---

[63] *E.g.*, *id.*

[64] *Id.* at 72.

[65] *MacDonald v. CashCall, Inc.*, 883 F.3d 220, 226 ("To do so, a party must at least reference the provision in its opposition to a motion to compel arbitration." (citations omitted)).

[66] *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) ("[I]f a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue."); *MacDonald*, 883 F.3d at 227 ("Without a specific challenge to a delegation provision, the court must treat that provision as valid and enforce it according to [the FAA]." (citations omitted)); *e.g.*, *S. Jersey Sanitation Co., Inc. v. Applied Underwriters Captive Risk Assurance Co.*, 840 F.3d 138, 143-44 (3d Cir. 2016); *see also Buckeye*, 546 U.S. at 445 ("[A]s a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract.").

[67] *Opalinski v. Robert Half Int'l Inc.*, 761 F.3d 326, 335 (3d Cir. 2014) (internal quotation marks omitted) (quoting *Howsam*, 537 U.S. at 83).

overcoming this presumption is "onerous, as it requires express contractual language unambiguously delegating the question of arbitrability to the arbitrator."[68]

Case law suggests that to demonstrate clear and unmistakable intent to delegate questions of arbitrability, provisions must be both specific and exclusive. For example, expressly stating that issues regarding the validity or enforceability of an arbitration agreement shall be determined by an arbitrator is likely sufficient.[69]  Expansive language that arbitration shall govern "any dispute of 'any kind' that arises 'in connection with' or 'relating to'" the arbitration agreement may also be helpful,[70] even if "a broadly worded arbitration clause is not enough" standing alone.[71]  Further, simply stating that an arbitrator *may* decide questions of arbitrability may not suffice if it is not clear that the parties want an arbitrator, and not a court, to determine arbitrability.[72]

Second, if the proponent of arbitration can establish that a delegation provision exists, the party opposing arbitration must specifically challenge the

---

[68]   *Id.* (citing *Major League Umpires Ass'n v. Am. League of Prof'l Baseball Clubs*, 357 F.3d 272, 280-81 (3d Cir. 2004)).

[69]   *E.g.*, *Caruso v. J&M Windows, Inc.*, 2018 WL 4579691, at *3 (E.D. Pa. Sept. 24, 2018); *Davis v. Uber Tech., Inc.*, 2017 WL 3167807, at *3 (E.D. Pa. July 25, 2017); *Pocalyko v. Baker Tilly Virchow Crouse, LLP*, 2016 WL 6962875, at *3 (E.D. Pa. Nov. 29, 2016).

[70]   *See HealthplanCRM, LLC v. AvMed, Inc.*, 458 F. Supp. 3d 308, 324 (W.D. Pa. 2020).

[71]   *Allstate Ins. Co. v. Toll Bros., Inc.*, 171 F. Supp. 3d 417, 426 n.8 (E.D. Pa. 2016) (citations omitted); *see AvMed*, 458 F. Supp. 3d at 324 ("[I]t is a starting point, because it at least does not foreclose the possibility that the parties intended to vest the arbitrator with the broadest possible jurisdiction.").

[72]   *E.g.*, *AvMed*, 458 F. Supp. 3d at 326 ("[S]imply incorporating by reference a rule that permits an arbitrator concurrent authority with the Court, without clarifying that the arbitrator's authority is exclusive, may be insufficient to show the required 'clear and unmistakable' intent.").

provision's validity.[73]  If the Court finds the provision valid, the arbitrator will determine all questions of arbitrability.[74]  If it does not, the court decides.[75]  The questions presented here are whether the Plan contains a delegation provision, thus relocating the authority to address Jean's challenges to the Plan's validity to the arbitrator, and whether that provision is valid.

Babcock and Duttera fail on step one.  Though they cite four provisions in support, none demonstrate the parties' clear and unmistakable intent to delegate questions of arbitrability to an arbitrator.  The Court consequently finds that Babcock and Duttera have not overcome the onerous burden of rebutting the presumption that courts determine arbitrability.  As a result, the Court concludes that it, not an arbitrator, must determine whether Jean's claims are arbitrable under the Plan.[76]

### 1.    Section 3

Duttera argues first that section 3 of the Plan demonstrates the parties' clear intent to delegate questions of arbitrability.  He offers little explanation in support of his contentions, but nevertheless contends that this section, which governs the scope of the Plan, is sufficient to overcome the onerous presumption that courts

---

[73]  *See Quilloin v. Tenet HealthSystem Phila., Inc.*, 673 F.3d 221, 228-30 (3d Cir. 2012).

[74]  *See Henry Schein*, 139 S. Ct. at 529 (holding that a valid delegation provision will be enforced even if "the argument for arbitration is wholly groundless").

[75]  *E.g.*, *Allstate Ins. Co. v. Toll Bros., Inc.*, 171 F. Supp. 3d 417, 423-24 (E.D. Pa. 2016).

[76]  Though Babcock and Duttera raised this issue for the first time in their reply briefs (and even then, only fleetingly), it is of sufficient importance to warrant greater attention from the Court.

determine arbitrability.  The section itself defines what matters fall within the

Plan's coverage, and thus which matters are subject to arbitration pursuant to the

Plan's procedures.  For his part, Duttera rests on the assertion that Jean is a

"member" of Kappa Delta Rho and so his claims

Section 3 of the Plan, titled Application and Coverage, states that:

> [T]his Plan applies to any legal or equitable Claim,
> Dispute, demand or controversy, in tort, in contract, under
> statute (local, state or federal), or alleging violation of any
> legal obligation, between persons bound by this Plan . . .
> which relates to, arises from, concerns or involves in any
> way any Claim or Dispute as defined, herein, arising out
> of or involving the Fraternity or any Fraternity activity.[77]

Read naturally, section 3 can be broken down into three clauses.  The first

clause limits the Plan's coverage to legal or equitable claims, disputes, demands, or

controversies.  Though section 3 does not explicitly define these terms, it clarifies

that they include claims brought "in tort, in contract," or "under statute," as well as

any claims or disputes "alleging violation of any legal obligation."[78]  A plain

reading of this clause thus suggests that the Plan applies solely to claims, disputes,

demands, or controversies where one party is asserting a freestanding legal right

against another.  For example, this would include claims for negligence, breach of

contract, or violation of a state anti-hazing statute.

---

[77]   Doc. 46-2 § 3.B.
[78]   *Id.*

The second clause limits the scope of the Plan to disputes between those who have agreed to be bound by it.  Accordingly, the Plan expressly confines its coverage to claims involving signatories to the agreement.  The third clause further qualifies the types of claims, disputes, demands, or controversies covered by the Plan.  Specifically, it limits the scope of the Plan's applicability to disputes "arising out of or involving the Fraternity or any Fraternity activity."[79]

It seems clear that section 3, on its face, does not evidence the parties' clear and unmistakable intent to delegate questions of arbitrability to an arbitrator. Nowhere in the provision is language stating that the Plan applies to disputes regarding the validity and enforceability of the Plan.  Nor is there any suggesting that the Plan applies to disputes beyond those expounded upon in the first clause (i.e., substantive legal claims).

The Plan's proffered definitions of the terms "claim" and "dispute" also do not provide any support for Duttera's interpretation.  The Plan defines a "claim" with language nearly verbatim to that used in section 3's first clause.[80]  The term

---

[79]  *Id.* When read together, the first and third clause state that the Plan applies to "any Claim, Dispute, demand or controversy . . . which relates to, arises from, concerns or involves in any way any Claim or Dispute, defined, herein, arising out of or involving the Fraternity or any Fraternity activity." *Id.*  Given the circularity in defining a claim, dispute, demand, or controversy as one which arises from a "Claim or Dispute," as well as Babcock's and Duttera's failure to elaborate on this point, the Court declines to engage in a semantic interpretation of this definition.  The Court further notes that the Plan's definitions of the terms "claim" and "dispute" are essentially consistent with the definitions propounded in the first and second clauses of section 3, respectively.

[80]  The Plan defines a claim as "any legal or equitable claim, demand or controversy for any personal injury, equitable relief or property damage arising out of any tort, statute (local, state or federal) or breach of contract involving the Fraternity.  This includes but is not limited to

- 15 -

"dispute" is also vaguely defined as a "claim, demand or controversy to which the Plan applies," or that occurs between parties bound by the Plan.[81]  Crucially, however, neither is expressly defined as encompassing questions of arbitrability; rather, they appear only to reinforce the scope of the Plan's coverage as stated in section 3.  And the Court cannot construe these terms more broadly than what is provided for by the plain language of the Plan.

## 2. Section 4

Babcock also argues that section 4 of the Plan, titled Resolution of Disputes, "plainly commits authority over issues such as arbitrability to the arbitrator."[82] Section 4 states that:

> All disputes not otherwise settled by the Parties shall be finally and conclusively resolved under this Plan and the Rules.

Babcock's argument fails because the language in section 4 is too broad to evidence the parties' clear and unmistakable intent to delegate questions of arbitrability to an arbitrator.  Even if the Court could construe the term "dispute" so broadly as to encompass *any* possible disagreement between parties to the Plan (it cannot),[83] courts have repeatedly held that such expansive language alone is

---

any allegation of negligence, intentional acts, defamation, discrimination, contribution or indemnity."  *Id.* § 2.E.

[81]  *Id.* § 2.F.

[82]  Doc. 28 at 5.

[83]  As discussed above, the Plan defines a "dispute" as any "claim, demand or controversy to which this Plan applies," or that is "between parties bound by the Plan or by an agreement to resolve disputes under the Plan . . . ."  Doc. 46-2 § 2.F.  Because the term dispute references section 3 (which governs the Plan's applicability and which this Court just analyzed), the Court

insufficient to establish the requisite intent.[84]  Accordingly, the Court cannot find that the language in section 4 is sufficient to overcome the presumption that courts determine arbitrability.

### 3.    Section 9

Babcock next asserts that section 9 of the Plan, titled Exclusive Remedy, evidences the parties' intent to delegate questions of arbitrability.  Section 9 provides that:

> Proceedings under the Plan shall be the exclusive, final and binding method by which Disputes are resolved. Consequently, the institution of a proceeding under this Plan shall be a condition precedent to the initiation of any legal action (including action before an administrative tribunal with adjudicatory powers) against the Fraternity arising out of the membership or participation in Fraternity activities of a member by the Fraternity and any such legal action shall be limited to those under the Act.

The first sentence of this section is insufficient because, like section 4, it lacks the requisite specificity.  Further, the term dispute, as defined by the Plan and as discussed above, does not extend so far as to encompass disagreements between the parties regarding questions of arbitrability.  The second sentence is also deficient because it does not specify that determinations of arbitrability must be determined by arbitration under the Plan.  Accordingly, the Court finds that section

---

is not free to use a different, and much more extensive, definition of the term in other provisions of the Plan.

[84]  *Toll Bros.*, 171 F. Supp. 3d at 426 n.8 (citations omitted).

9 does not demonstrate the parties' clear and unmistakable intent to delegate questions of arbitrability.

### 4.   Section 29

Finally, Babcock points to section 29 of the Rules, titled Scope of Arbitrator's Authority, as evidence of the parties' intent to have arbitrability determined by arbitration.  Section 29 states that:

> The arbitrator's authority shall be limited to the resolution of legal disputes between the Parties in the same manner as a court of general jurisdiction in the venue.   This includes but is not limited to determination of jurisdiction and dispositive motions.

This statement fails for lack of both specificity and exclusivity.  Nowhere in section 29 is there any reference to questions of arbitrability.  Further, even if the Court found this provision as granting the arbitrator authority to address questions of arbitrability, it does not state that such authority is *exclusive*.  Merely giving the arbitrator concurrent authority to determine questions of arbitrability is, on its own, insufficient to establish that the parties intended the arbitrator to exclusively decide these questions.  As a result, the Court finds that the Plan does not expressly reserve for the arbitrator questions of arbitrability, and thus that the Court is empowered to address Jean's challenges to the Plan's validity.

## B.    Unconscionability

Under Pennsylvania law, a party may void an unconscionable contract.[85]  To do so, the party challenging an arbitration agreement bears the burden of demonstrating "that the agreement is *both* procedurally and substantively unconscionable."[86]  A contract is substantively unconscionable when it unreasonably favors "the party with the greater bargaining power."[87]  In contrast, "'[p]rocedural unconscionability' describes the process by which the parties entered into the contract,"[88]  and it exists where one party lacks a meaningful choice in bargaining for or accepting a particular provision.[89]

Pennsylvania appears to have adopted a "sliding-scale approach" to unconscionability.[90]  Under this formulation, where procedural unconscionability "'is very high, a lesser degree of substantive unconscionability may required,' and presumably, vice-versa."[91]  Further, courts evaluate the unconscionability of both the contract as a whole and its individual terms.[92]  As a result, a court may hold a contract unenforceable where it is thoroughly permeated with unconscionability;

---

[85]    *Ostroff v. Alterra Healthcare Corp.*, 433 F. Supp. 2d 538, 543 (E.D. Pa. 2006).

[86]    *Zimmer v. CooperNeff Advisors, Inc.*, 523 F.3d 224, 230 (3d Cir. 2008) (citations omitted).

[87]    *Ostroff*, 433 F. Supp. 2d at 543 (citations omitted); *Witmer v. Exxon Corp.*, 434 A.2d 1222, 1228 (Pa. 1981); *Denlinger, Inc. v. Dendler*, 608 A.2d 1061, 1068 (Pa. Super. 1992).

[88]    *Ostroff*, 433 F. Supp. 2d at 542-43 (quoting *Metalized Ceramics for Elecs., Inc. v. Nat'l Ammonia Co.*, 663 A.2d 762, 767 (Pa. Super. 1995) (Olszewski, J., concurring)).

[89]    *Salley v. Option One Mortg. Corp.*, 925 A.2d 115, 119 (Pa. 2007) (citing *Denlinger, Inc. v. Dendler*, 608 A.2d 1061, 1068 (Pa. Super. 1992)).

[90]    *Quilloin*, 673 F.3d at 230 (quoting *Salley*, 925 A.2d at 125 & n.12).

[91]    *Id.*

[92]    *E.g.*, *Ostroff*, 433 F. Supp. 2d (finding that specific unconscionable provisions rendered the entire contract unconscionable).

however, where an agreement contains only one or several unconscionable terms, it may choose to merely sever those provisions and enforce the remainder of the contract as written.[93]

### 1.   Substantive Unconscionability

"Substantive unconscionability looks to the terms of the arbitration clause itself and whether the arbitration clause is unreasonably favorable to the party with greater bargaining power."[94]  In other words, "an arbitration provision is substantively unconscionable if it 'create[s] an arbitration procedure that favors one party over another.'"[95]  Importantly, however, "[a]n arbitration agreement cannot be construed as substantively unconscionable where it 'does not alter or limit the rights and remedies available to [a] party in the arbitral forum.'"[96]

Examples of factors that may make an arbitration provision substantively unconscionable include: "severe restrictions on discovery,"[97] "high arbitration costs borne by one party,"[98] "limitations on remedies,"[99] and "curtailed judicial

---

[93]  *Nino v. Jewelry Exchange, Inc.*, 609 F.3d 191, 206 (3d Cir. 2010).

[94]  *Griffen v. Alpha Phi Alpha, Inc.*, 2007 WL 707364, at *6 (E.D. Pa. Mar. 2, 2007) (citing *Witmer*, 432 A.2d at 1228).

[95]  *Ostroff*, 433 F. Supp. 2d at 543 (alterations in original) (citing *Johnson v. West Suburban Bank*, 225 F.3d 366, 378 n.5 (3d Cir. 2000)).

[96]  *Quilloin*, 673 F.3d at 230 (cleaned up) (quoting *Edwards v. HOVENSA, LLC*, 497 F.3d 355, 364 (3d Cir. 2007)).

[97]  *Ostroff*, 433 F. Supp. 2d at 543 (citing *Walker v. Ryan's Family Steak Houses, Inc.*, 400 F.3d 370, 387-88 (6th Cir. 2005)).

[98]  *Id.* (citing *Spinetti v. Serv. Corp. Int'l*, 324 F.3d 212, 216-17 (3d Cir. 2003)).

[99]  *Id.* (citing *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 670-71 (6th Cir. 2003)).

review."[100]  An arbitration agreement may also be unconscionable where it allows

one party to unilaterally select an arbitrator,[101] or to unilaterally amend the

arbitration agreement.[102]  In short, there are no hard and fast rules governing what

makes an agreement unconscionable.  And the question of whether a particular

contract or provision is substantively unconscionable is ultimately one in the

court's discretion.

Jean points to a number of the Plan's terms that he claims are

unconscionable.  This includes provisions limiting discovery and judicial review,

unfairly imposing costs upon Jean, allowing Kappa Delta Rho to unilaterally

amend or terminate the Plan, and permitting Kappa Delta Rho to unilaterally select

the arbitral forum and two members of a panel of arbitrators.  He further argues

that these terms, when considered together, render the Plan entirely unenforceable

because they put Jean at a gross disadvantage.  Each of the challenged provisions is

discussed in turn.[103]

---

[100]  *Id.* (citing *Hooters of Am., Inc. v. Phillips*, 39 F. Supp. 2d 582, 614 (D.S.C. 1998), *aff'd* 173 F.3d 933 (4th Cir. 1999)).

[101]  *E.g.*, *Trout v. Organización Mundial de Boxeo, Inc.*, 965 F.3d 71, 81 (1st Cir. 2020).

[102]  *E.g.*, *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1179 (9th Cir. 2003).

[103]  The Court notes an oddity in the posture of the parties' arguments; although it is Babcock, Duttera, and the Iota Chapter seeking to compel arbitration, the parties focus solely on the Plan's unconscionability as between Jean and Kappa Delta Rho.  Given the somewhat bizarre format of the Plan (which bills itself as a global arbitration agreement yet in many ways is designed for bilateral arbitration), the Court will address the unconscionability of the Plan as it relates to Jean and Kappa Delta Rho.  The Court's conclusion is bolstered by the fact that Kappa Delta Rho's participation in arbitration (regardless of whether claims are brought against Kappa Delta Rho) is mandated by the Plan.

### a. Limited Judicial Review

Jean first argues that the Plan's provisions restricting judicial review to the mechanisms available under the FAA are unconscionable.  The Plan provides that judicial review of any arbitral award "shall be governed by the [FAA]."[104]  The Plan does not, however, purport to limit judicial review below that which is permitted under the FAA.  Sections 10 and 11 of the FAA allow parties to vacate, modify, or correct arbitral awards in certain circumstances.[105]  Thus, at least on its face, the Plan allows aggrieved parties to challenge the enforcement of any arbitral award against them under §§ 10 or 11.

Jean contends that the Plan's failure to provide for robust judicial review is unconscionable because it does not expressly state that parties may seek judicial review of any arbitral award.  He further posits that limiting the availability of judicial review is inherently unfair and unconscionable because it deprives parties of the opportunity to appear before a federal judge, who will apply "binding law and Federal Rules of Civil Procedure and Evidence."[106]

Jean's arguments are without merit.  It is clear to the Court that the limited grounds for judicial review provided for by §§ 10 and 11 of the FAA are not

---

[104] Doc. 146-2 § 33.A (Rules).

[105] 9 U.S.C. §§ 10, 11.  The grounds for vacatur, modification, or correction are intentionally narrow "to preserve due process but not to permit unnecessary public intrusion into private arbitration procedures."  *Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*, 341 F.3d 987, 998-99 (9th Cir. 2003) (en banc).

[106] Doc. 48 at 18.

inherently unconscionable.[107]  It may be unconscionable for a party to deny one party the opportunity to seek *any* form of judicial review,[108] just as it may be unconscionable for one party to adopt procedures that prevent parties from effectively invoking judicial review.[109]  But merely requiring both parties to seek review under the FAA is not enough to make an arbitration agreement unreasonably unfair.  Accordingly, the Court finds the Plan's limitations on judicial review not unconscionable.

### b.  Costs of Arbitration

Jean next asserts that arbitration cannot be compelled because a genuine dispute of material fact exists regarding the unconscionability of the Plan's imposition of costs and fees.  The Plan provides that each party must bear its own costs, including the expenses of producing witnesses and attorneys' fees.[110]  The Plan also states that "[m]ember parties shall not be responsible for payment of fees and expenses of proceedings under these Rules."[111]  Fees that fraternity members are explicitly not required to pay include "required travel of an arbitrator, expenses

---

[107]  In fact, parties may *only* modify an arbitral award under §§ 10 or 11 when a party seeks judicial confirmation of an arbitral award under § 9 of the FAA.  *Hall St. Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 586 (2008).

[108]  *E.g.*, *Phillips*, 39 F. Supp. 2d at 602, 614.

[109]  *E.g.*, *Openshaw v. FedEx Ground Package Sys., Inc.*, 731 F. Supp. 2d 987, 997 (C.D. Cal. 2010) (finding unconscionable a provision forbidding the arbitrator from issuing a written opinion or reasoning to explain any award); *Lucey v. FedEx Ground Package Sys., Inc.*, 2007 WL 3052997, at *13 (D.N.J. Oct. 18, 2007) (same), *aff'd in part and rev'd in part on other grounds*, 305 Fed. Appx. 875 (3d Cir. 2009).

[110]  Doc. 46-2 §§ 31.A, B (Rules).

[111]  *Id.* § 31.C (Rules).

of an arbitrator and the cost of any proof produced at the discretion of an arbitrator."[112]

Beyond the burden of attorneys' fees and witness expenses, the only other cost member parties are responsible for is a $1,000 filing fee for arbitration proceedings initiated by the member.[113] "[A]ll other fees" are to be paid by Kappa Delta Rho.[114] However, the Plan states that the cost of these fees may be awarded against the Member "as part of an award of costs."[115] The Plan does not have a reciprocal provision permitting members to recover any expenses (including the $1,000 filing fee) against Kappa Delta Rho.

Jean argues that more factual development is needed regarding the fees for which Kappa Delta Rho has agreed to pay, and which may eventually be awarded against Jean. Because the Plan does not specify or estimate the amount of fees to be paid by Kappa Delta Rho, Jean claims it is not possible, at this stage, to determine whether the costs he may ultimately be required to bear are unconscionably high. He also points out the one-sided nature of the Plan's cost-shifting provision, which permits Kappa Delta Rho to recover its costs while not allowing Jean to do the same.

---

[112] *Id.*

[113] *Id.* § 31.C.ii (Rules). Member parties are also responsible for a $100 filing fee "if the Parties go to mediation or other non-binding means" of resolution. *Id.* § 31.C.i (Rules).

[114] *Id.* § 31.C.ii (Rules).

[115] *Id.*

"An arbitration provision that makes the arbitral forum prohibitively expensive for a weaker party is unconscionable."[116]  But to show that an arbitral forum would be prohibitively expensive, the party seeking to avoid arbitration "bears the burden of showing the likelihood of incurring such costs."[117]  To meet this burden, a party ordinarily must proffer some evidence showing "either her inability to pay her share or the high cost of arbitration."[118]  Simply pointing to an arbitration agreement's silence on the allocation of costs, by itself, is "plainly insufficient."[119]

In the interest of giving parties a fair opportunity to meet this burden, limited discovery is permitted regarding "the narrow issue of the estimated costs of arbitration and the claimant's ability to pay."[120]  Jean, however, has apparently chosen not to take advantage of this procedure or present any evidence regarding his inability to pay or estimating the future costs of arbitration.[121]  Instead, he

---

[116]  *Clymer v. Jetro Cash & Carry Enters., Inc.*, 334 F. Supp. 3d 683, 692 (E.D. Pa. 2018) (internal quotation marks omitted) (quoting *Parilla v. IAP Worldwide Servs., VI, Inc.*, 368, F.3d 269, 284 (3d Cir. 2004)

[117]  *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 92 (2000).

[118]  *See Alexander*, 341 F.3d at 268 (citing *Blair v. Scott Specialty Gases*, 283 F.3d 595, 607-08 (3d Cir. 2002)).

[119]  *See Green Tree*, 531 U.S. at 91 ("The record reveals only the arbitration agreement's silence on the subject, and that fact alone is plainly insufficient to render it unenforceable.").

[120]  *Blair*, 283 F.3d at 609 ("Without some discovery, albeit limited [in scope] . . . it is not clear how a claimant could present information on the costs of arbitration as required by *Green Tree* and how the defendant could meet its burden to rebut the claimant's allegation that she cannot afford to pay the cost." (citing *Livingston v. Assocs. Fin., Inc.*, 2001 WL 709465, at *2 (N.D. Ill. June 25, 2001))).

[121]  Though Jean contests Babcock's motion to stay discovery, he does so only on the general basis that Babcock has failed to meet his burden of showing good cause.  Doc. 44.

argues only that the Plan's silence on the costs to be paid create a genuine dispute of material fact.  But precedent unambiguously establishes that an agreement's silence on such an issue cannot render the agreement unenforceable.[122]  The Court can thus neither find the presence of a genuine dispute nor can it hold the cost-shifting provision, as written, unconscionable.

### c.    Unilateral Amendment and Termination

Jean also contends that the provisions allowing Kappa Delta Rho to unilaterally amend and terminate the Plan are unconscionable.  Sections 5 and 6 of the Plan grant Kappa Delta Rho exclusive authority to amend or terminate the Plan and Rules under certain circumstances.  Section 5.A permits amendment of the Plan so long as 30-days' notice is given; further, amendments are inapplicable to any matter of which Kappa Delta Rho had actual notice on the date of amendment.[123]  Section 5.B authorizes amendment of the Rules, provided that parties to the Plan both receive notice and consent to any amendments.  Finally, section 6 lets Kappa Delta Rho terminate the Plan ten days after all parties have received notice and consented to the termination.  Termination of the Plan (under section 6) and amendments to the Rules (under section 5.B) are not retroactive.

Beyond stating that allowing only one party to amend or terminate the Plan or Rules is unfair, Jean offers little explanation as to why these provisions are

---

[122] *See Green Tree*, 531 U.S. at 91.
[123] Doc. 46-2 § 5.A.

unconscionable.  In response, the Iota Chapter briefly states that these unilateral amendment and termination provisions are "of no moment" because Kappa Delta Rho has never actually invoked these provisions to amend or terminate the Plan.[124] Both parties appear to miss the relatively extensive body of law dedicated to the impact of unilateral-amendment provisions on the enforceability of arbitration agreements.

"Even when unilateral modification rights are explicitly granted in a contract, those clauses are often found valid as illusory or unconscionable."[125] Many courts have found that the grant of such rights renders an arbitration agreement illusory because it makes the contract entirely optional for one party.[126] When one party may terminate or change the agreement at will, he is not in fact obligated to do anything under the contract; the agreement thus fails for lack of

---

[124] Doc. 47 at 18.

[125] *Bd. of Trustees, Sheet Metal Workers' Nat'l Pension Fund v. Four-C-Aire, Inc.*, 2017 WL 1479425, at *9 (E.D. Va. Apr. 21, 2017), *rev'd on other grounds*, 929 F.3d 135 (4th Cir. 2019); *see Tanadgusix Corp. v. ARM, Ltd.*, 429 F. Supp. 3d 677, 689 (D. Alaska 2019).

[126] *E.g.*, *Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1219 (10th Cir. 2002) ("We join other circuits in holding that an arbitration agreement allowing one party the unfettered right to alter the arbitration agreement's existence or its scope is illusory." (citations omitted)); *Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202, 208-09 (5th Cir. 2012) (finding unilateral-modification provision illusory); *Floss v. Ryan's Family Steak Houses, Inc.*, 211 F.3d 306, 315-16 (6th Cir. 2000); *Gibson v. Neighborhood Health Clinics, Inc.*, 121 F.3d 1126, 1132 (7th Cir. 1997) (same). *But see Blair*, 283 F.3d at 604 (finding a unilateral-modification provision not illusory because it required notice and consent); *Murray v. Grocery Delivery E-Servs. USA Inc.*, 460 F. Supp. 3d 93, 98 (D. Mass. 2020) (same).

consideration.[127]  Other courts have also found unilateral-modification provisions to be unconscionable under state law.[128]

Whether a contract is unconscionable or whether it is illusory are often distinct questions.[129]  Nonetheless, it appears to the Court that a provision's consistency (or lack thereof) with state or federal law is relevant to determining whether the provision is unconscionable.[130]  Pennsylvania common law is clear that contractual modifications are permitted "only by the assent of both parties, and only if the modification is founded upon consideration."[131]  Accordingly, the Court finds the question of whether the Plan violates this common-law rule (by rendering

---

[127] *SCF Consulting, LLC v. Barrack, Rodos & Bacine*, 175 A.3d 273, 280 (Pa. 2017) (Dougherty, J., concurring) ("If the promise is entirely optional with the promisor, it is said to be illusory and, therefore, lacking consideration and unenforceable.  The promisor has committed him/herself to nothing." (internal quotation marks and citations omitted)).

[128] *See Gibson v. Nye Frontier Ford, Inc.*, 205 P.3d 1091, 1097 (Alaska 2009) (noting the "prevalence of the view that arbitration clauses that may be changed unilaterally are unconscionable"); *e.g.*, *Ingle*, 328 F.3d at 1179 (finding unilateral-modification provision unconscionable under California law).

[129] *But see, e.g.*, *Ingle*, 328 F.3d at 1179 (holding that the grant of unilateral-modification rights was unconscionable in part because it rendered the broader agreement illusory).

[130] This is consistent with the principle that contractual terms which attempt to restrict one party's legal rights under the law are generally unconscionable.  *See, e.g.*, *Quilloin*, 673 F.3d at 234 (finding a time limit on initiating arbitration not unconscionable as it provided the employee "the full amount of time permitted by law"); *Ingle*, 328 F.3d at 1175 (finding an arbitration agreement's statute of limitations provision unconscionable in part because it conflicted with the continuing-violation doctrine available under state statute); *Plaskett v. Bechtel Int'l, Inc.*, 243 F. Supp. 2d 334, 340 (D.V.I. 2003) (finding an attorneys' fee provision unconscionable because it conflicted with Title VII's mandate that a prevailing plaintiff shall generally be awarded attorneys' fees).

[131] *Corson v. Corson's, Inc.*, 434 A.2d 1269, 1271 (Pa. Super. 1981) (citing *Wilcox v. Regester*, 207 A.2d 817 (Pa. 1965)); *see also In re Commonw. Renewable Energy, Inc.*, 540 B.R. 173, 189 (W.D. Pa. 2015) ("While a contract may be altered after its formation, all parties must mutually agree to the new terms and consideration must be exchanged." (first citing *Great N. Ins. Co. v. ADT Sec. Servs.*, 517 F. Supp. 2d 723, 736 (W.D. Pa. 2007); and then citing *J.W.S. Delavau v. E. AM. Trans. & Warehousing, Inc.*, 810 A.2d 672, 681 (Pa. Super. 2002))).

the agreement illusory) relevant to its broader determination of these provisions' unconscionability.[132]

"As a general matter, 'an arbitration agreement allowing one party the unfettered right to alter the arbitration agreement's existence or its scope is illusory.'"[133]  The United States Court of Appeals for the Third Circuit articulated a similar rule under Pennsylvania law in *Blair v. Scott Specialty Gases*.[134] Synthesizing post-*Blair* caselaw, *Crump v. MetaSource Acquisitions, LLC* found that courts in this Circuit have generally found unilateral-modification provisions not illusory where they require that: (1) modifications be made in *writing*; (2) all parties be provided *notice*; (3) all parties *consent* to any modifications; and (4) modifications be effective "only *prospectively*."[135]

After careful consideration, the Court holds that section 5.A is unconscionable because it renders the agreement to arbitrate illusory and because it unreasonably advantages Kappa Delta Rho.  Section 5.A only satisfies two of the four factors set forth in *Crump*; it necessitates notice and (partially) prohibits retroactivity of amendments.  Importantly, however, it does not require that

---

[132] *See also Batory v. Sears, Roebuck & Co.*, 456 F. Supp. 2d 1137, 1140 (D. Ariz. 2006) (finding a unilateral-modification provision in an arbitration agreement unconscionable because it "has effectively taken away Plaintiff's ability to consider and negotiate the terms of his contract.").

[133] *Crump v. MetaSource Acquisitions, LLC*, 373 F. Supp. 3d 540, 545 (E.D. Pa. 2019) (quoting *Dumais*, 299 F.3d at 1219).

[134] *Id.* (citing *Blair*, 283 F.3d at 604).

[135] *Id.* (emphasis added) (first citing *Gutman v. Baldwin Corp.*, 2002 WL 32107938, at *4 (E.D. Pa. 2002); and then citing *Bourgeois v. Nordstrom, Inc.*, 2012 WL 42917, at *6 (D.N.J. 2012)).

amendments be in writing or that parties to the Plan consent to the amendments. The Court thus finds that section 5.A gives Kappa Delta Rho essentially unfettered discretion to modify its obligations under the Plan, thereby rendering the agreement to arbitrate illusory.[136]

Moreover, despite Pennsylvania courts' silence on the matter, the Court believes that section 5.A of the Plan is unreasonably unfair.[137]  While it requires notice, the Plan does not mandate that changes to the Plan be formalized in writing; the Court finds this troubling as it opens the door for informal modifications and alterations to a binding agreement.  The Court also acknowledges the unconscionability of imposing obligations on a party without its consent.  This is especially problematic given that modifications are, in some circumstances,

---

[136]  Section 5.A authorizes Kappa Delta Rho to unilaterally modify sections 5.B and 6, which are contained in the Plan (not the Rules) and which govern amendments to the Rules and termination of the Plan.  As a result, the Court deems it unnecessary to address whether either of these provisions make the Plan illusory or are unconscionable.  The Court also makes clear that it is *not* denying the motions to compel on the basis that the Plan is illusory; rather it is merely incorporating the illusory-agreement analysis into its discussion of the Plan's unconscionability.

[137]  The Court emphasizes that it does not base its opinion on a conflation of the principles of mutuality and unconscionability.  Though some courts have held that a lack of mutuality in obligation may render a contract (or one of its provisions) unconscionable, the Court need not address such questions to find section 5.A of the Plan unconscionable under Pennsylvania law. *Compare Ingle*, 328 F.3d at 1179 (holding a unilateral-modification provision unconscionable under California law for lack of mutuality), *with Hardin v. First Cash Fin. Servs., Inc.*, 465 F.3d 470, 479 (10th Cir. 2006) (acknowledging that Oklahoma law permits "reasonable modification provisions"); *Al-Safin v. Circuit City Stores, Inc.*, 394 F.3d 1254, 1260-61 (9th Cir. 2005) (same under Washington law); *Iberia Credit Bureau, Inc. v. Cingular Wireless LLC*, 379 F.3d 159, 173 (5th Cir. 2004) (same under Louisiana law); *Graves v. George Fox Univ.*, 2007 WL 2363372, at *7 (D. Idaho Aug. 16, 2007) (distinguishing *Ingle* under Idaho and Oregon law).

retroactive.[138]  Accordingly, the Court concludes that section 5.A of the Plan is

unconscionable.[139]

### d.  Arbitrator Selection

Next, Jean challenges the Plan's arbitrator-selection process as

unconscionable.  This process, governed by section 5 of the Rules, is as follows.[140]

Once Kappa Delta Rho has selected the arbitral forum, the forum must create and

distribute a list of potential arbitrators to each party.[141]  The parties may strike as

many names from this list as they want, and may number the remaining arbitrators

(if any) in order of preference.[142]  The arbitral forum then will select an arbitrator

who has been approved by each party.[143]  If an arbitrator cannot be selected

---

[138] Requiring consent may be as simple as allowing parties to accept modifications to the Plan by continuing in their relationship with Kappa Delta Rho.  *See Blair*, 283 F.3d at 604.  In contrast, section 5.A takes away the opportunity for parties to reject the amendment by quitting the fraternity and thus disavowing its applicability.  Instead, because the Plan defines "members" of the fraternity as current or *former* members of Kappa Delta Rho (and because Kappa Delta Rho does not allow parties to terminate their participation in the Plan), amendments made to the Plan after a member had left would presumably still apply to his claims even if he resigned from the fraternity in protest of future modifications.  In such circumstances, amendments would be effective so long as the former member was provided notice.  This result is doubly concerning given that amendments created *after* Kappa Delta Rho becomes aware of an incident but *before* proceedings are initiated will apply retroactively to any claims arising from the incident.

[139] It is also appropriate to find section 5.A unconscionable even though Kappa Delta Rho has not yet utilized the provision to amend the terms of the Plan.  *E.g.*, *Longnecker v. Am. Express Co.*, 23 F. Supp. 3d 1099, 111 (D. Ariz. 2014).  Courts may refuse to enforce a contract that was "unconscionable *at the time it was made.*"  *Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 469 A.2d 563, 567 (Pa. 1983) (emphasis added) (internal quotation marks omitted) (quoting 13 Pa. C.S. § 2302).  The Court thus finds it inapposite to essentially wait and see whether an agreement's provision is in fact used unconscionably before addressing its unconscionability.

[140] Doc. 46-2 § 5.

[141] *Id.*

[142] *Id.*

[143] *Id.*

through this process, the forum then distributes a list of three arbitrators; each party receives one strike, with the remaining name serving as the arbitrator.[144]

Section 5 also states that "[i]n the sole discretion of [Kappa Delta Rho], two (2) additional arbitrators may be selected to hear the full trial on the merits of the matter."[145]  It is this sentence which Jean claims is unconscionable.  Jean maintains that this provision gives Kappa Delta Rho unilateral authority to both elect for an arbitral panel and select at least two of the panel's members.  The Iota Chapter offers no direct response to this, pointing only to the process outlined in section 5 governing the appointment of a single arbitrator.

Though binding precedent on this precise issue is lacking, it seems clear to the Court that a provision in an arbitration agreement which allows one party to unilaterally select the presiding arbitrator (or arbitrators) is unconscionable.[146]

---

[144] *Id.*  It is unclear how this process would work in a situation, like that faced here, involving multiple parties.

[145] *Id.*

[146] *See Trout*, 965 F.3d at 79 ( ("Trout's contention that the arbitration agreement is 'unreasonable and unjust' because the arbitrator-selection provision permits [the defendant] to act as both 'party and judge' has obvious force, notwithstanding that he does not identify any direct authority to support his contention that the arbitral agreement may not be enforced in consequence."); *see also Jackson v. Payday Fin., LLC*, 764 F.3d 765, 781 (7th Cir. 2014) ("[The arbitration agreement] is substantively unconscionable because it allowed [the defendants] to manipulate what purported to be a fair arbitration process by selecting the arbitrator and proceeding according to nonexistent rules."); *McMullen v. Meijer, Inc.*, 355 F.3d 485, 491, 494 (6th Cir. 2004) (finding a provision granting one party "unilateral control over the pool of potential arbitrators" prevented arbitration "from being an effective substitute for a judicial forum" for an inherent lack of neutrality); *Phillip*s, 173 F.3d at 940 (finding an arbitration agreement that allowed one party to control the selection of arbitrators so fundamentally unfair as to constitute a breach of contract); *Roberts v. Time Plus Payroll Servs., Inc.*, 2008 WL 376288, at *3 (E.D. Pa. Feb. 7, 2008) ("We find that an agreement giving only one side a voice in choosing the adjudicator raises an appearance of partiality and conclude that this provision is substantively unconscionable . . . ."); *Nishimura v. Gentry Homes, Ltd.*,

Arbitrators often exercise significant authority over arbitration proceedings; in this case, the chosen arbitrator (or arbitral panel) has exclusive control over the scope and manner of discovery, the resolution of evidentiary disputes, and ultimately, the outcome of the case.[147] It is thus fairly obvious why allowing one party to select the arbitrator in a given matter becomes problematic.[148]

The issue here is whether the sentence in section 5 giving Kappa Delta Rho sole discretion to elect for the selection of two additional arbitrators is unconscionable. This question is difficult, in part because section 5 does not specify *how* these additional arbitrators are to be chosen. The operative sentence is hopelessly vague, and could be interpreted as either allowing Kappa Delta Rho to unilaterally designate two arbitrators to serve on a panel of three, or merely requiring that the process for appointing an arbitrator be repeated two more times. While the latter is surely permissible, the former is certainly not.

---

338 P.3d 524, 534 (Haw. 2014) (striking down a provision allowing the agent of one party to select an arbitral forum in its "sole discretion" as fundamentally unfair); *cf. Franke v. Poly-America Med. & Dental Benefit Plan*, 555 F.3d 656, 658 (8th Cir. 2009) (distinguishing *Phillips* as involving an agreement "riddled with provisions that allowed Hooters, among other things, to choose the arbitrators and unilaterally modify the arbitral rules without notice."); *Personacare of Reading, Inc. v. Lengel*, 2017 WL 2772706, at *4 (E.D. Pa. June 27, 2017) ("Defendants have presented no evidence to show that Plaintiff has any sort of control over the pool of potential arbitrators that would be available to Defendants."); *Progressive Pipeline Mgmt., LLC v. N. Abbonizio Contractors, Inc.*, 2011 WL 1343031, at *7 (E.D. Pa. Apr. 7, 2011) (same).

[147] Doc. 46-2 § 10 (Rules) (Pre-Hearing Discovery); *id.* § 18 (Rules) (Evidence); *id.* § 30 (Rules) (Judicial Proceedings and Exclusion of Liability).

[148] *See also Trout*, 965 F.3d at 79 n.5 (cleaned up) ("A well-recognized principle of 'natural justice' is that a man may not be a judge in his own cause." (quoting *In re Cross & Brown Co. v. Nelson*, 4 A.D.2d 501, 502 (N.Y. Sup. Ct. 1957))).

The Court concludes that this sentence is unconscionable because its ambiguity opens the door for an unconscionable result.  The Plan delegates to the arbitrator authority to interpret the Plan's terms.  Consequently, it is not impossible for Kappa Delta Rho to simply select two arbitrators to serve on a panel which will then retroactively bless Kappa Delta Rho's interpretation of section 5.[149]  Given the arbitrator's expansive power under the Plan, such a result would be patently unconscionable.  The Court thus finds that this sentence creates such a high risk of unconscionability that it is, itself, unconscionable.[150]

---

[149] This provision also undercuts any argument that this sentence can be saved by the Plan's requirement that no arbitrator may serve who has "any financial or personal interest in the result of the proceeding."  Doc. 46-2 § 6 (Rules).  First, this section mandates only that arbitrators be prohibited from serving if they have an interest in the result of a *particular* proceeding.  But unlike other cases finding that such a limiting qualification may make a unilateral-appointment provision not unconscionable, Jean would have no recourse for breach of contract if the arbitrators chosen interpreted this rule narrowly.  *Compare Willis v. Nationwide Debt Settlement Grp.*, 878 F. Supp. 2d 1208, 1224-25 (D. Or. 2012) (finding a provision allowing one party to select the arbitrator not unconscionable because the agreement required the chosen arbitrator be "independent"), *and Davis v. Glob. Client Sols., LLC*, 2011 WL 4738547, at *4 (W.D. Ky. Oct. 7, 2011) (same), *with Trout*, 965 F.3d at 80-81 (rejecting a similar argument because the agreement only required that the arbitrator *act* fairly, not that he be independent).  Second, and as will be discussed below, the Plan's limitations on who may serve as an arbitrator are dubious because objections to an arbitrator's qualifications are to be conclusively decided by the arbitral forum, which is to be unilaterally selected by Kappa Delta Rho.  Doc. 46-2 § 6 (Rules).  ("Prior to accepting appointment, the prospective arbitrator shall disclose any circumstance likely to prevent a prompt hearing or create a presumption of bias.  Upon receipt of such information . . . the [arbitral forum] will either replace that person or communicate the information to the Parties for comment. . . the [arbitral forum] may disqualify that person and its decision shall be conclusive.").

[150] Also relevant to the Court's ruling is the interest in disincentivizing parties from drafting vague contracts that leave open the possibility of an unconscionable interpretation (this principle is often effectuated in contract law under the rule of *contra proferentem*, which construes ambiguities in an agreement against the drafter).  Though the Court ordinarily assumes that parties will act in good faith in selecting an arbitrator, *see Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 30 (1991), the ease with which Kappa Delta Rho could have reformed this provision cautions the Court that this ambiguity was intentional.  The Court is likewise not convinced that it should require the parties to "wait and see" whether the Plan is in fact

### e.    Arbitral Forum Selection

Jean relatedly asserts that the Plan is unconscionable because it authorizes Kappa Delta Rho to unilaterally select the arbitral forum.  Section 3.B of the Rules states that, once a member has initiated proceedings under the Plan, Kappa Delta Rho shall, within ten days of receiving notice, select an "Arbitration Association" (the arbitral forum).[151]  Kappa Delta Rho's selection is limited, however, to "any federal or state-recognized Arbitration Association, or a similar, local group of arbitrators."[152]  The Plan does not provide members with any input on the arbitral forum selected, or provide for any method of objection.

Jean argues that this provision is unfair because it gives Kappa Delta Rho exclusive authority to select the arbitral forum, which is in turn responsible for creating the pool of potential arbitrators.  As noted above, section 5 of the Rules specifies that the arbitral forum shall curate and distribute the list of arbitrators, from which one is ultimately chosen.[153]  The arbitral forum also has authority to resolve objections regarding the perceived fairness of a chosen arbitrator; if an arbitrator discloses information "likely to prevent a prompt hearing or create a

---

interpreted unconscionably before entertaining Jean's challenges.  *E.g.*, *Willis*, 878 F. Supp. 2d at 1224-25 (finding an unconscionability challenge based on ambiguous language "premature and speculative"); *Davis*, 2011 WL 4738547, at *4 (rejecting the plaintiffs' argument because "[i]n theory, Defendants will comply, and the clause will not result in injustice to Plaintiffs," and because the plaintiffs would, in any event, have an adequate post-arbitration remedy under § 10 of the FAA).

[151] Doc. 46-2 § 3.B (Rules).

[152] *Id.* § 2.A.

[153] *Id.* § 5 (Rules).

presumption of bias," the arbitral forum "will either replace the person or communicate the information to the Parties for comment."[154]  The forum's decision to disqualify (or not disqualify) an arbitrator on this basis "shall be conclusive."[155]

Just as courts have found the unilateral selection of an arbitrator unconscionable, so too have they found that provisions allowing one party to control the creation of the pool of potential arbitrators are unconscionable or fundamentally unfair.  Courts have thus repeatedly expressed reservations regarding provisions either designating a biased arbitral forum which controls the pool of potential arbitrators,[156] or giving one party direct and exclusive authority over the pool's creation.[157]

While parties do not *need* to specify an arbitral forum in an agreement to arbitrate,[158] it seems to the Court that it would be unconscionable to allow one

---

[154] *Id.* § 6 (Rules).

[155] *Id.*

[156] *E.g.*, *Floss v. Ryan's Family Steak Houses, Inc.*, 211 F.3d 306, 314 (6th Cir. 2000) ("In light of [the arbitral forum's] role in determining the pool of potential arbitrators, any such bias would render the arbitral forum fundamentally unfair."); *Geiger v. Ryan's Family Steak Houses, Inc.*, 134 F. Supp. 2d 985, 990-91 (S.D. Ind. 2001) (same); *Huffman v. Sticky Fingers, Inc.*, 2005 WL 8165097, at *10 (D.S.C. Dec. 20, 2005) ("Other courts have expressed grave reservations about the fairness of [a particular arbitral forum], in light of [that forum's] potential financial interest in contracting with employers for arbitration services." (citations omitted)); *Nishimura*, 338 P.3d at 534.

[157] *E.g.*, *McMullen*, 355 F.3d at 491, 494 (finding a provision granting one party "unilateral control over the pool of potential arbitrators" prevented arbitration "from being an effective substitute for a judicial forum" for an inherent lack of neutrality); *Phillips*, 173 F.3d at 938-39.

[158] *E.g.*, *Flanzman v. Jenny Craig, Inc.*, 236 A.3d 990, 1002 (N.J. 2020); *Home Inspections of VA & WV, LLC v. Hardin*, 852 S.E.2d 240, 245-46 (W.V. 2020); *see also Khan v. Dell Inc.*, 669 F.3d 350, 354 (3d Cir. 2012) (noting that the unavailability of an arbitral forum specified in an agreement to arbitrate does not bar enforcement of the agreement unless selection of that particular forum was an "integral part of the agreement to arbitrate").

party to simply select an arbitral forum with unfettered discretion.[159]  Unlike

federal courts, arbitral forums are private entities unconstrained by the mandate of

due process that necessitates a fair and impartial tribunal.[160]  Forgoing certain legal

protections in the name of expediency is often justified for many parties, and it is

not this Court's place to question the value of such an exchange.[161]  Nevertheless,

it is important to be wary of arbitration agreements that attempt to substitute a

fundamentally biased arbitral system in lieu of formal litigation.[162]

That said, the Court finds the Plan's provision permitting Kappa Delta Rho

to unilaterally select the arbitral forum is unconscionable because Kappa Delta

Rho's discretion is subject to no meaningful limitation.  First, the Plan's definition

of the term "Arbitration Association" is extremely vague and of little import; while

---

[159]  *Cf. Mance v. Mercedes-Benz USA*, 901 F. Supp. 2d 1147, 1165 (N.D. Cal. 2012) (finding an agreement that allows the claimant to select from two arbitration associations not unconscionable); *Swallow v. Toll Bros., Inc.*, 2008 WL 4164773, at *5 (N.D. Cal. Sept. 8, 2008) (concluding that a provision allowing the drafting party to select either a "successor" of the American Arbitration Association or a "similar" association not unconscionable); *Cronin v. Citifinancial Servs., Inc.*, 2008 WL 2944869, at *5 (E.D. Pa. July 25, 2008) (finding not unconscionable a provision requiring either the NAF or AAA to serve as the applicable arbitration association).

[160]  *See Davis v. Prudential Secs., Inc.*, 59 F.3d 1186, 1191 (11th Cir. 1995) ("[W]e agree with the numerous courts that have held that the state action element of a due process claim is absent in private arbitration cases." (citations omitted)); *see also Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 876 (2009) ("[A] fair trial in a fair tribunal is a basic requirement of due process." (internal quotation marks and citations omitted)).

[161]  *Gilmer*, 500 U.S. at 30 ("[G]eneralized attacks on arbitration 'res[t] on suspicion of arbitration as a method of weakening the protections afforded in the substantive law to would be complainants,' and as such, they are 'far out of step with our current strong endorsement of the federal statutes favoring this method of resolving disputes.'" (alterations in original) (quoting *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 481 (1989))).

[162]  *Phillips*, 173 F.3d at 940 (referring to such a scheme as "a sham system unworthy even of the name of arbitration").

it states that the chosen arbitral forum shall be "any federal or state-recognized [forum], or a similar, local group of arbitrators," it does not explain what "a similar, local group of arbitrators is" or offer any insight into how that phrase might reasonably be limited. As stated, it suggests that any local association of arbitrators may properly serve as the arbitral forum, which is, in the Court's view, simply too broad.[163]

Second, and more troublingly, the Plan does not require that the arbitral forum selected be independent or impartial. The absence of any provision to this effect is notable given the Plan's qualifications required of the individual arbitrators chosen to preside over a given matter. Consequently, as written, the Plan allows Kappa Delta Rho to select a fundamentally biased arbitral forum, which would then possess the exclusive authority to shape and control the selection of an arbitrator or arbitral panel. Such a result is plainly unconscionable. The Court accordingly determines that this provision is unconscionable.

### f.    Limited Discovery

Finally, Jean contends that the Plan's restrictions on the scope of discovery are unconscionable. Section 18.A of the Rules provides that "[t]he arbitrator shall be the sole judge of the relevance, materiality and admissibility of evidence

---

[163] The Court likewise notes that every arbitral forum is local to somewhere. Moreover, the Plan does not specify what it means for an arbitral forum to be recognized on the local level (the fact of recognition being the only similarity the Court can draw between a "federal or state recognized" forum and a "similar, local group of arbitrators"). Thus, rather than restrict Kappa Delta Rho's discretion to select an arbitral forum, this term appears to expand it.

offered.  Conformity to legal rules shall not be necessary."[164]  The arbitrator is also

authorized under sections 18.B and 18.C to subpoena witnesses or documents "at

the request of a Party or on the arbitrator's own initiative," and to consider

evidence of witnesses "by affidavit or declaration."[165]  Discovery is limited,

however, by section 10.B, which prohibits the arbitrator from allowing more than

twenty hours of depositions, or twenty interrogatories, requests for production, or

requests for admission per side, absent a showing of good cause.[166]

Jean predicates the unconscionability of these provisions on the broad

unconscionability of the Plan.  Specifically, Jean claims that permitting the

arbitrator to control discovery is unconscionable given Kappa Delta Rho's power

to select the arbitral forum (and by extension, its power over the selection of the

arbitrator or arbitral panel).  He further takes issue with the sentence in section

18.A of the Rules, which states that "[c]onformity to legal rules is not required."

He suggests that this shows that the arbitrator or arbitrations will not act fairly or

pursuant to federal rules of procedure.  He also maintains it is broadly unfair to not

be able to proceed before an unbiased federal judge.

In *Gilmer v. Interstate/Johnson Lane Corp.*,[167] the United States Supreme

Court "explicitly held that limitations on discovery do not necessarily render an

---

[164] Doc. 46-2 § 18.A (Rules).
[165] *Id.* §§ 18.B, C (Rules).
[166] *Id.* § 10.B (Rules).
[167] 500 U.S. 20 (1991).

arbitration provision invalid."[168]  The Supreme Court did so because "by agreeing to arbitrate, a party 'trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration.'"[169] Accordingly, *Gilmer* found discovery restrictions appropriate so long as they allowed claimants "a fair opportunity to present their claims."[170]

Here, the Court cannot find that the Plan's provisions, standing alone, are unconscionable.  Put simply, they do not appear to deprive Jean of a fair opportunity to present his claims.  The Plan neither flatly prohibits certain types of discovery nor prevents Jean from requesting further discovery on a showing of good cause.[171]  The Plan's restrictions on discovery also apply equally to all parties.  Overall, while more limited than that available under the Federal Rules of Civil Procedure, the discovery permitted by the Plan appears sufficient to allow each party to make its case.  Consequently, the Court concludes that the Plan's discovery provisions are not unconscionable.[172]

---

[168]  *Ostroff*, 433 F. Supp. 2d at 545 (citing *Gilmer*, 500 U.S. at 31).

[169]  *Gilmer*, 500 U.S. at 31 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985)).

[170]  *Id.*

[171]  *Cf. Ostroff*, 433 F. Supp. 2d at 545-46 (finding it unconscionable for an arbitration agreement to restrict the parties from taking depositions of anyone other than the opposing party's expert witnesses).

[172]  While these provisions cannot be found unconscionable in isolation, their broad grant of authority over discovery to the arbitrator enhances the Court's concerns regarding the extent of Kappa Delta Rho's control over the selection of the arbitral forum (and its possible control over the creation and selection of the arbitral panel).  The authority to preside over discovery is significant, and the Court is cognizant that even facially neutral provisions may become unconscionable where connected to a fundamentally biased proceeding.  *E.g., Walker*, 400

### 2.    Procedural Unconscionability

"Procedural unconscionability pertains to the process by which an agreement is reached" and the agreement's form.[173]  For a contract to be procedurally unconscionable, there must be an "absence of meaningful choice on the part of one of the parties."[174]  In general, there are two types of procedural unconscionability that may give rise to a party's lack of meaningful choice.

The first is "unfair surprise"; this "involves contractual terms which are not typically expected by the party who is being asked to 'assent' to them."[175]  "An unexpected clause often appears in the boilerplate of a printed form and, if read at all, is often not understood."[176]  Accordingly, this type of procedural unconscionability may be established by pointing to a party's capacity for understanding the contract, or the circumstances surrounding the contract's formation.[177]  Other relevant factors may include whether the party received

F.3d at 387 ("[T]he limited discovery, controlled by a potentially biased arbitration panel . . . creates the unfairness to claimants." (cleaned up) (quoting *Geiger*, 134 F. Supp. 2d at 996)).

[173]  *Alexander*, 341 F.3d at 265 (internal quotation marks omitted) (quoting *Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 181-82 (3d Cir. 1999)).

[174]  *Germantown Mfg. Co. v. Rawlinson*, 491 A.2d 138, 145 (Pa. Super. 1985).

[175]  *Id.* at 146.

[176]  *Id.*

[177]  *See id.* (emphasizing that a contract's signatory was crying as she read the relevant documents and that the contract's "harsh allocation of risks was not manifested in a manner reasonably comprehensible to her"); *see also Harris*, 183 F.3d at 181.

guidance regarding the contract,[178] or whether the agreement contains "fine print and convoluted or unclear language."[179]

The second type of procedural unconscionability involves contracts that engender "apparent but not genuine assent."[180] This commonly refers to contracts where one party is well-aware of the terms he is agreeing to but lacks any meaningful ability to reject the contract.[181] For example, a party "who requires goods or services important to his physical or economic well-being may have little or no choice but apparently to assent to the terms of a printed form dictated by the party with superior bargaining power."[182]

This principle underlies the general rule that contracts of adhesion are ordinarily considered procedurally unconscionable.[183] Contracts of adhesion are "standard-form contract[s] prepared by one party, to be signed by the party in a weaker position, usually a consumer, who adheres to the contract with little choice about the terms"[184] However, "merely because a contract is one of adhesion does

---

[178] *See Germantown*, 491 A.2d at 147 (noting that "neither the insurance agent nor [the party's] husband offered her any guidance as to the extent of the liability to which she was agreeing."); *Griffen*, 2007 WL 707364, at *5 n.9 (noting that the party's "ready access to lawyers" weighed against a finding of procedural unconscionability).

[179] *Harris*, 183 F.3d at 181 (citations omitted).

[180] *Germantown*, 491 A.2d at 147 (emphasis omitted).

[181] *See id.* (citations omitted).

[182] *Id.* (internal quotation marks and citations omitted).

[183] *See Alexander*, 341 F.3d at 265 (citing *Ting v. AT&T*, 319 F.3d 1126, 1128 (9th Cir. 2003)).

[184] *Curtis v. Cintas Corp.*, 229 F. Supp. 3d 312, 320 (E.D. Pa. 2017) (internal quotation marks omitted) (quoting *Salley*, 925 A.2d at 125-28).

not render it unconscionable and unenforceable as a matter of law."[185]  Rather,

courts must consider several factors in determining whether a contract of adhesion

is procedurally unconscionable.[186]  This includes "'the take-it-or-leave-it nature of

the standardized form of the document,' 'the parties relative bargaining positions,'

and 'the degree of economic compulsion motivating the adhering party.'"[187]

Jean argues that both types of procedural unconscionability are present here.

Regarding the second prong, he claims that the Plan is an unconscionable contract

of adhesion, the terms of which Jean had no ability to negotiate or reject.  Jean

further points to the fact that the contract was drafted by (presumably) Kappa Delta

Rho's attorneys, and that it was presented on a take-it-or-leave-it basis.  He also

posits that Jean was unable to join any other fraternity because the only bid he

received was from the Iota Chapter.

In response, the Iota Chapter contends that form contracts are not considered

contracts of adhesion where not involving "employment or the provision of

essential services."[188]  The Iota Chapter relies on this point to emphasize that the

Plan was not presented on a take-it-or-leave-it basis because Jean was under no

compulsion to join a fraternity in the first place.  The Iota Chapter additionally

---

[185] *Salley*, 925 A.2d at 127 (citing *Todd Heller, Inc. v. United Parcel Serv., Inc.*, 754 A.3d 689 (Pa. Super. 2000)).

[186] *Golden Gate Nat'l Senior Care, LLC v. Beavens*, 123 F. Supp. 3d 619, 632 (E.D. Pa. 2015).

[187] *Id.* (quoting *Quilloin*, 673 F.3d at 235-36).

[188] Doc. 51 at 4.

highlights the lack of evidence showing that Jean actually rushed any other

fraternities; it thus maintains that Jean has not met his burden of proof.

The Iota Chapter also relies on *Griffen v. Alpha Phi Alpha, Inc.*, which

addressed factual circumstances and legal challenges similar to the present case.[189]

There, the court found that a short, three-paragraph, standardized arbitration

agreement created by the Alpha Phi Alpha fraternity was not procedurally

unconscionable.[190]  The *Griffen* court determined that there was insufficient

evidence justifying a hearing on the question of whether the contract there was one

of adhesion.  It further decided that, in any event, the plaintiff had failed to show

he was unable to join another fraternity.

The Court agrees with the Iota Chapter that the Plan is not a contract of

adhesion.  Under Pennsylvania law, exculpatory agreements "involving use of a

commercial facility for *voluntary athletic or recreational activities*" are not

considered adhesion contracts.[191]  The justification for this is that "[t]he signer is

under no compulsion, economic or otherwise, to participate, much less to sign the

exculpatory agreement, because it does not relate to essential services."[192]  Though

this reasoning applies to exculpatory contracts, the Court finds its reasoning

applicable in the arbitration context as well.  Joining a fraternity is a voluntary

---

[189] 2007 WL 707364 (E.D. Pa. Mar. 2, 2007).
[190] *Id.* at *5-6.
[191] *Toro v. Fitness Int'l LLC*, 150 A.3d 968, 975 (Pa. Super. 2016).
[192] *Id.* (cleaned up) (quoting *Chepkevich*, 2 A.3d 1174, 1191 (Pa. 2010)).

recreational activity, which is not essential to a person's livelihood or security.

Consequently, the Court concludes that form arbitration agreements governing

entry into a fraternity are likely not contracts of adhesion under Pennsylvania law.

Moreover, the Court cannot hold that the Plan is procedurally

unconscionable as engendering "apparent but not genuine assent."  To be sure, the

Plan was presented on a take-it-or-leave-it basis,[193] and Kappa Delta Rho is a

national fraternity with significantly more bargaining power than Jean, a

prospective member and individual college student.  Nevertheless, the Plan not

procedurally unconscionable (on this basis) because joining a fraternity is

ultimately a voluntary activity.  In this context, take-it-or-leave-it contracts created

by parties with superior bargaining power are simply less oppressive and unfair

than those involving essential services like housing or employment.

However, just because the Plan does not fall within the rubric of under the

second type of procedural unconscionability does not preclude it from falling

within that of the first.  On this point, Jean argues that he was a twenty-year-old

college student with minimal understanding of legal concepts or contracts.  He

further asserts that the length and form of the Plan, containing thirty-three sections

across twelve pages, was confusing and difficult to understand.  The Iota Chapter

largely responds by pointing to *Griffen* and maintaining that Jean was a legal adult

---

[193]  Jean could literally take the Plan as-is or leave it.

and on Bucknell's Dean's List.  The Iota Chapter also contends that the Plan's terms were clear and easily understood.

The Court determines that the Plan is procedurally unconscionable because it manifests "unfair surprise."  A cursory review of the Plan and the New Membership Agreement reveals a number of inconsistent and overly vague terms.  For example, the Plan states that it extends to any and all disputes arising between the fraternity and its members.  But, in direct contrast and immediately preceding the Plan, the Financial Commitment expressly provides that members who fail to pay their dues will be responsible for "court costs" incurred by Kappa Delta Rho as a result, and requires members to agree to waive personal-jurisdiction defenses in future "litigation" arising from the agreement.[194]

More fundamentally, the Plan fails to define with any particularity the parties' rights and obligations.  For example, the Plan refers repeatedly to "the hearing" the parties will presumably have, while not explaining what this hearing is, who may appear at it, or if the parties even have a right to it.[195]  Likewise, while

---

[194] Another inconsistency involves the three distinct choice-of-law provisions scattered throughout the New Membership Registration Form. Doc. 46-2 at 8 (requiring application of Pennsylvania law under the Financial Commitment); *id.* § 7.B (empowering the arbitration to "determine and implement the applicable law" under the Plan); *id.* § 33.B (Rules) (designating the appropriate law as that "which would be applied by the Federal Circuit Court of Appeals for the state where the event occurred").

[195] The Plan also confusingly references this as "*the* hearing" even while suggesting, at one point, that this may merely be "the *first* hearing."  *Compare id.* § 14 (Rules) ("Before proceeding with the first hearing . . . ."), *and id.* § 12 (Rules) ("The arbitrator shall maintain the privacy of *the hearings* to the extent permitted by law."), *with id.* at § 19 (Rules) ("All documentary evidence to be considered by the arbitrator(s) shall be filed at *the hearing* . . . .").

the Plan describes at length specific terms regarding discovery, the form of arbitral award, and even whether an arbitrator is required to take an oath, it never actually sets forth the core components of the arbitration process.  A party could thus read this Plan and understand the specific provisions while having no idea to what he is actually agreeing.

Compounding upon this is the fact that the provisions themselves, when viewed at a granular level, are riddled with ambiguous and confusing language. Examples include those discussed above in this opinion, as well as statements like: "[s]ervice may be made at any place, provided that the Party served has had a reasonable opportunity to be heard with regard to service."[196]  Another confusing provision is the arbitrator-selection process system, which is clearly designed for a bilateral, two-party dispute despite the fact that the Plan is essentially a global agreement encompassing claims involving multiple parties.[197]

Considered as a whole, the Court concludes that the Plan is procedurally unconscionable because it is so confusing that Jean could not have meaningfully agreed to the terms of the Plan as they were actually presented to him.  Jean was only twenty-years-old when he agreed to the Plan; while he was on Bucknell's Dean's List, he lacked a legal background or education.  As has been discussed above, the terms of the Plan and the New Membership Registration Form are so

---

[196] *Id.* at § 22 (Rules).  What this means is lost on the Court.
[197] *Id.* at § 5 (Rules).

inconsistent and vague that it is difficult for this Court to conclude that Jean meaningfully chose to bind himself under the Plan. The ambiguities baked within many of the Plan's provisions represent, in this Court's opinion, a classic case of "unfair surprise." Accordingly, the Court finds the Plan procedurally unconscionable.

### 3.   Severability

Because the Court has determined that the Plan is both substantively and procedurally unconscionable, it must next consider whether it should sever the unconscionable provisions from the broader agreement to arbitrate. To determine whether the terms of an agreement may be severed, a court's "central task is to ascertain" whether the parties intended the contract to be severable.[198] "[A]bsent express language that a contract is entire, a court may look to the contract as a whole, including the character of the consideration . . . and may also consider the circumstances surrounding the execution of the contract, the conduct of the parties, and any other factor pertinent to ascertaining the parties' intent."[199]

In the arbitration context, the Third Circuit has further clarified that the question of severability implicates "two lines of inquiry."[200] The first asks whether the "unconscionable aspects 'of the employment arbitration agreement constitute []

---

[198] *Jacobs v. CNG Transmission Corp.*, 772 A.2d 445, 452 (Pa. 2001).
[199] *Id.*
[200] *Nino*, 609 F.3d at 206.

an essential part of the agreed exchange of promises' between the parties."[201]
Thus, if an unconscionable term is not an "essential aspect of the arbitration
agreement, then the unconscionable provisions may be severed and the remainder
of the arbitration agreement enforced."[202]

The second consideration is whether the unconscionable provisions
demonstrate a "systematic effort to impose arbitration" on a disadvantaged party,
"not simply as an alternative to litigation, but as an inferior forum that works to"
one party's advantage.[203]  Consequently, where an agreement's terms unreasonably
put one party at a "severe disadvantage," the "cumulative effect of so much
illegality" may prevent a court from enforcing the agreement.[204]  In such
circumstances, where "the sickness has infected the trunk, [the court] must cut
down the entire tree."[205]

While none of the unconscionable provisions in the Plan appear to be an
"essential aspect of the arbitration agreement," the Court finds that the number and
nature of these provisions demonstrates an effort to systematically disadvantage
fraternity members who seek to arbitrate against Kappa Delta Rho under the Plan.
By design, the Plan gives Kappa Delta Rho an inordinate amount of power by

---

[201] *Id.* (alterations in original) (internal quotation marks omitted) (alterations in original) (quoting *Spinetti*, 324 F.3d at 214).
[202] *Id.* (citing Restatement of Contracts (Second) § 184(1)).
[203] *Id.* (internal quotation marks omitted) (quoting *Parilla*, 368 F.3d at 288).
[204] *Alexander*, 341 F.3d at 271.
[205] *Id.*

letting it select the arbitral forum, unilaterally alter the terms of the Plan without members' consent, and elect for the selection of an arbitral panel.  Further, the inclusion of plainly ambiguous language throughout the Plan indicates to the Court an intentional attempt to insert unconscionable terms and give Kappa Delta Rho an unreasonable advantage over other parties.

## IV.    CONCLUSION

Accordingly, the Court declines to sever the unconscionable terms and enforce the remainder of the Plan.  The three motions to compel, and the motion to stay discovery pending resolution of the motions to compel, are therefore denied.

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge