## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOHN JEAN,

   Plaintiff,

  v.

BUCKNELL UNIVERSITY, *et al.*,

   Defendants.

No. 4:20-CV-01722

(Judge Brann)

## MEMORANDUM OPINION

### APRIL 16, 2021

Pending before this Court is Defendant Bucknell University's motion to dismiss.[1]  On September 22, 2020, Plaintiff John Jean commenced this suit against Bucknell, the National Fraternity of Kappa Delta Rho ("Kappa Delta Rho"), the Kappa Delta Rho Iota Chapter (the "Iota Chapter") located on Bucknell's campus, and three members of the Iota Chapter.[2]  Jean alleges that he was hazed during an event that took place from September 10-11, 2020.[3]

This motion is now ripe for disposition; for the following reasons, Bucknell's motion to dismiss is granted.

---

[1] Doc. 23.
[2] Doc. 1.  The three members are William Babcock, Dillon Duttera, and Nicholas Zanghetti.  *Id.*
[3] *Id.*

## I.    BACKGROUND[4]

### A.    The Hazing Incident

In fall 2020, Jean, a sophomore at Bucknell, applied to join the Iota Chapter of the Kappa Delta Rho fraternity located on Bucknell's campus.[5]  His application was accepted, and on September 8, 2020, Jean received a "bid" (invitation) to "pledge" (join) the Iota Chapter.[6]  Soon after, members of the Iota Chapter scheduled an "initiation" for that year's "pledge class" (those students who had received and accepted bids to join the fraternity).[7]  The initiation was scheduled for the night of September 10, 2020, and was referred to by some members of the Iota Chapter as the first of several "lessons."[8]  Jean was one of seven pledges invited to the initiation.[9]

At the event, the pledges were instructed to play a drinking game.[10]  To play, each would take a turn drinking from a two-liter bottle of vodka.[11]  Regardless of how much alcohol was left, the last pledge to drink was required to finish the remainder of the bottle.[12]  The purpose of the game seems to be for each pledge to drink enough from the bottle so as to prevent the last pledge from having to

---

4    All background facts are drawn from the Complaint.  Doc. 1.
5    *Id.* ¶¶ 5, 17.
6    *Id.* ¶ 18.
7    *Id.* ¶ 19.
8    *Id.*
9    *Id.*
10   *Id.* ¶ 20.
11   *Id.*
12   *Id.*

consume a disproportionately large amount.[13]  Throughout the game, members of the Iota Chapter "screamed, chanted, and cheered," which encouraged and pressured the pledges to drink.[14]

Jean was the third pledge to drink from the bottle, which became empty by the fifth pledge.[15]  After finishing the game, the pledges were instructed to continue drinking beer and hard liquor.[16]  Jean, who is 5'4" and weighs 130 pounds, became extremely inebriated.[17]  Without elaborating on the details, Jean alleges that he was violently hazed throughout evening, and that the hazing was led by Defendants William Babcock (the Iota Chapter president) and Dillon Duttera (the Iota Chapter "pledge master").[18]  At some point, Jean attempted to exit the fraternity house to return to his dorm, but was not allowed to leave.[19]

When Jean was later able to leave the fraternity house, he was confronted outside by Defendant Nicholas Zanghetti, one of the seven Iota Chapter pledges in Jean's pledge class.[20]  Zanghetti told Jean not to leave, and then punched him in

---

[13]  *See id.*
[14]  *Id.* ¶ 21.
[15]  *Id.* ¶ 20.
[16]  *Id.* ¶ 22.
[17]  *Id.* ¶ 23.
[18]  *Id.* ¶¶ 25, 31-32.
[19]  *Id.* ¶ 24.
[20]  *Id.* ¶¶ 8, 26.

the face.[21]  Jean fell and hit his head on the ground.[22]  He began vomiting, and lost consciousness.[23]

A Bucknell Safety Officer who witnessed this happen called 911, although he did not ultimately report the incident to the police.[24]  After being transported to a nearby hospital, Jean was treated for alcohol poisoning and a head-injury/concussion (caused by Zanghetti).[25]  Jean was further treated for extensive bruising on his face, arms, torso, legs, and backside from being punched and kicked at the initiation.[26]  He also suffered cigarette burns on his feet.[27]

Following these events, Jean alleges that Bucknell attempted to keep word of what happened within "campus walls" in an effort to avoid taking adverse or disciplinary action against the involved students or the Iota Chapter.[28]  To this end, Jean claims that Bucknell's Director of Fraternity and Sorority Affairs Natalie Brewster neglected to conduct "any real investigation into what happened."[29]  Jean further maintains that Bucknell has failed to meaningfully enforce its anti-hazing policies.[30]  It is not clear whether any fraternity members or the Iota Chapter were ever punished in relation to this incident.

---

[21] *Id.* ¶ 26.
[22] *Id.* ¶ 27.
[23] *Id.*
[24] *Id.* ¶ 28.
[25] *Id.* ¶¶ 29-30.
[26] *Id.* ¶ 31.
[27] *Id.* ¶ 32.
[28] *Id.* ¶ 43.
[29] *Id.* ¶ 45.
[30] *Id.* ¶ 46.

### B.      The 2009 Iota Chapter Ban

In 2009, Bucknell banned the Iota Chapter from campus for hazing for three years.[31]  At the same time, Kappa Delta Rho National also revoked the chapter's recognition for four years.[32]  The Iota Chapter eventually returned to campus, and it was required to remain dry (alcohol-free) for one year.[33]  The Complaint does not allege that any disciplinary action has been taken against the Iota Chapter since it returned to campus.  However, the Complaint does assert that Bucknell has created "a permissive campus environment for fraternity life," which has resulted in students drinking on a regular basis "in the open, out in the street, on campus, within full view of campus security and administration officials."[34]

### C.      Procedural Posture

On September 22, 2020, Jean filed suit against Bucknell, Kappa Delta Rho, the Iota Chapter, and three members of the Iota Chapter (Babcock, Duttera, and Zanghetti).[35]  The Complaint asserts three claims against Bucknell.  These three claims are for hazing (Count I), negligence (Count IV), and negligence per se (Count VI).[36]  Bucknell now seeks to dismiss all counts against it pursuant to Federal Rule of Civil Procedure 12(b)(6).[37]

---

[31]  *Id.* ¶ 33.
[32]  *Id.*
[33]  *Id.* ¶ 35.
[34]  *Id.* ¶ 56.
[35]  *See generally id.*
[36]  *Id.*
[37]  Doc. 23.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), the Court dismisses a complaint, in whole or in part, if the plaintiff has failed to "state a claim upon which relief can be granted."  A motion to dismiss "tests the legal sufficiency of a pleading"[38] and "streamlines litigation by dispensing with needless discovery and factfinding."[39]  "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law."[40]  This is true of any claim, "without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one."[41]

Following the Roberts Court's "civil procedure revival,"[42] the landmark decisions of *Bell Atlantic Corp. v. Twombly*[43] and *Ashcroft v. Iqbal*[44] tightened the standard that district courts must apply to 12(b)(6) motions.[45]  These cases "retired" the lenient "no-set-of-facts test" set forth in *Conley v. Gibson* and replaced it with a more exacting "plausibility" standard.[46]

---

[38]  *Richardson v. Bledsoe*, 829 F.3d 273, 289 n.13 (3d Cir. 2016) (Smith, C.J.) (citing *Szabo v. Bridgeport Machines, Inc.,* 249 F.3d 672, 675 (7th Cir. 2001) (Easterbrook, J.)).

[39]  *Neitzke v. Williams,* 490 U.S. 319, 326–27 (1989).

[40]  *Id.* at 326 (citing *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984)).

[41]  *Id.* at 327.

[42]  Howard M. Wasserman, The Roberts Court and the Civil Procedure Revival, 31 Rev. Litig. 313, 316, 319-20 (2012).

[43]  550 U.S. 544 (2007).

[44]  556 U.S. 662, 678 (2009).

[45]  *Id.* at 670 (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957))

[46]  *Id.* (citing *Conley*, 355 U.S. at 45-46).

Accordingly, after *Twombly* and *Iqbal*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[47] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[48] "Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully."[49] Moreover, "[a]sking for plausible grounds . . . calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [wrongdoing]."[50]

The plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[51] No matter the context, however, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"[52]

When disposing of a motion to dismiss, the Court "accept[s] as true all factual allegations in the complaint and draw[s] all inferences from the facts

---

[47] *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).
[48] *Id.*
[49] *Connelly v. Lane Const. Corp.*, 809 F.3d 780 (3d Cir. 2016) (Jordan, J.) (internal quotation marks and citations omitted).
[50] *Twombly*, 550 U.S. at 556.
[51] *Iqbal*, 556 U.S. at 679.
[52] *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557).

alleged in the light most favorable to [the plaintiff]."[53]   However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions."[54]   "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[55]

As a matter of procedure, the United States Court of Appeals for the Third Circuit has instructed that:

> Under the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps. First, it must tak[e] note of the elements [the] plaintiff must plead to state a claim. Second, it should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, [w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.[56]

## III.   DISCUSSION

### A.   Negligence

Bucknell first seeks to dismiss Jean's negligence claim (Count IV) on the basis that Bucknell owed no legal duty to Jean.   In response, Jean sets forth two theories purportedly establishing Bucknell's duty of care.   First, while acknowledging no recognized duty extending to the facts of this case,[57] Jean nevertheless insists that the creation of a new common-law duty is warranted under

---

[53]  *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008) (Nygaard, J.).

[54]  *Iqbal*, 556 U.S. at 678 (internal citations omitted); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (Nygaard, J.) ("After *Iqbal*, it is clear that conclusory or 'bare-bones' allegations will no longer survive a motion to dismiss.").

[55]  *Iqbal*, 556 U.S. at 678.

[56]  *Connelly*, 809 F.3d at 787 (internal quotations and citations omitted).

[57]  *See Humphries v. Pa. State Univ.*, 2020 WL 5878409, at *8 (M.D. Pa. 2020).

*Althaus ex rel. Althaus v. Cohen*.[58]  Second, Jean cites three provisions of the

Restatement (Second) of Torts as imposing a common-law duty on Bucknell.

The Court concludes that Bucknell did not have a duty to Jean under these

facts.  Consequently, Count IV of the Complaint against Bucknell is dismissed.

### 1.   *Althaus* Factors

"The primary element in any negligence cause of action is that the defendant

owes a duty of care to the plaintiff."[59]  A plaintiff may establish duty by looking to

standards of care previously recognized and accepted under state common law.[60]

Or, where no relevant duty of care applies, a plaintiff may ask a court to articulate

and create a new duty.[61]  Acknowledging that the concept of duty is rife with

amorphous considerations of public policy, the Pennsylvania Supreme Court in

*Althaus* set forth five factors for courts to consider when determining whether to

formulate a new duty of care.[62]  These factors include:

> (1) The relationship between the parties;
>
> (2) the social utility of the actor's conduct;

---

[58]  756 A.2d 1166, 1169 (Pa. 2000).

[59]  *Id.* at 1168 (citing *Gibbs v. Ernst*, 647 A.2d 882, 890 (Pa. 1994)); *see also Kline v. Ball*, 452 A.2d 727, 729 (Pa. Super. 1982) ("Tort liability must be founded upon some blameworthy conduct, or lack of due care resulting in the violation of a duty owing to others.).

[60]  *See Dittman v. UPMC*, 196 A.3d 1036, 1044 (Pa. 2018).

[61]  *Althaus*, 756 A.2d at 1169-70; *e.g.*, *Kenner v. Kappa Alpha Psi Fraternity, Inc.*, 808 A.2d 178, 183 (Pa. Super. 2002) (imposing a duty on a national fraternity and its officers to "protect initiates from harm").

[62]  *Althaus*, 756 A.2d at 1169 ("[T]he legal concept of duty of care is necessarily rooted in often amorphous public policy considerations, which may include our perceptions of history, morals, justice, and society." (citations omitted)); *see also Vickodil v. Commonwealth of Pa., Ins. Dep't*, 559 A.2d 1010, 1013 (Pa. Commw. 1989).

(3) the nature of the risk imposed and foreseeability of the harm incurred;

(4) the consequences of imposing a duty upon the actor; and

(5) the overall public interest in the proposed solution.[63]

However, just because a court *may* create a new duty does not necessarily mean that it should.  In fact, the Supreme Court of Pennsylvania has cautioned courts that they should not "enter into the creation of new common law duties lightly," given that "the adjudicatory process does not translate readily into the field of broad-scale policymaking."[64]  Its "default position" is thus that, "unless the justifications for and consequences of judicial policymaking are reasonably clear with the balance of factors favorably predominating, [the Court] will not impose new affirmative duties."[65]

Jean urges this Court to articulate a new duty encompassing Bucknell's conduct in this case.  Although he describes it only vaguely, the duty Jean seeks to impose appears to require colleges to regulate and control fraternities that the college specifically knows are likely to engage in hazing of new initiates and pledges.  Jean contends that such a duty is warranted under the *Althaus* factors, and that it naturally extends to Bucknell's actions here because Bucknell's decision to

---

[63]  *Althaus*, 756 A.2d at 1169.

[64]  *Feleccia v. Lackawanna College*, 215 A.3d 3, 13 (Pa. 2019) (internal quotation marks omitted) (quoting *Lance v. Wyeth*, 85 A.3d 434, 454 (2014)).

[65]  *Seebold v. Prison Health Servs., Inc.*, 57 A.3d 1232, 1245 (Pa. 2012) (citing *Cafazzo v. Central Med. Health Servs., Inc.*, 668 A.2d 521, 527 (Pa. 1995)).

ban the Iota Chapter from campus in 2009 put it on notice that members of the Iota Chapter would likely haze future members in the future.

The Court disagrees because the *Althaus* factors do not favorably predominate in favor of creating a new duty.  First, the arrangement between Bucknell and Jean is that of an ordinary university-student relationship, and such an arrangement does not justify imposing a higher duty of care than what is already provided for by Pennsylvania common law.  Further, while Bucknell did allow its fraternities to use its website to facilitate their bidding processes, this link is simply too remote to support a heightened standard of care.[66]

The second factor considering the consequences of imposing a new duty on Bucknell is similarly of no help to Jean.  Imposing a high duty of care on Bucknell (i.e., requiring it to *actually* prevent hazing) would place a massive burden on Bucknell's resources and capabilities.  Beyond shuttering every fraternity suspected of or disciplined for hazing, or requiring direct supervision of any such fraternity, it is not clear how Bucknell would be able to meet this duty.  In contrast, imposing a reduced and more ambiguous standard of care (i.e., merely requiring Bucknell to *take steps* to prevent hazing) significantly reduces the likelihood that

---

[66] *Compare Kenner*, 808 A.2d. at 182-83 (citing the contractual relationship between a fraternity member and the fraternity's national office as supporting imposition of a duty of care to protect initiates from harm caused by hazing).

Bucknell will be found to have breached its duty.[67]  Consequently, the Court finds that this factor weighs against creating a new duty.

The remaining factors are also insufficient to warrant articulating a new duty of care on Bucknell.  The third regarding the nature of the harm and the harm's foreseeability, for example, is a wash.  Although the harm caused by hazing is extremely serious, its foreseeability with any level of specificity is low; Bucknell might have been aware that hazing would occur on its campus *at some point* while having no knowledge that *Jean* would be hazed at a specific initiation event.[68]  Further, the second and fourth factors (considering the social utility and public interest of imposing a duty, respectively) weigh in Jean's favor,[69] but are not enough, on their own, to justify creating a new standard of care.[70]

---

[67]  This is especially true given that Bucknell's notice of the Iota Chapter's propensity for hazing arises from Bucknell having temporarily banned the fraternity from campus ten years prior. *See also id.* at 183 (finding that the plaintiff had failed to point to facts establishing breach of the newly created duty of care).

[68]  While the *Kenner* court considered foreseeability at a high level of generality, the Court concludes it appropriate to also evaluate foreseeability as it would apply to specific occurrences.  The Court finds such an approach apposite given that the relationship between a university and one of its fraternities is more attenuated than that between a national fraternal organization and one of its local chapters.  *Compare id.* ("Renal failure and the possibility of death are substantial harms and injuries Kappa knew could (and did) occur during the initiation process.").

[69]  *See id.* (noting that "the social utility of a national fraternity's efforts to stop hazing is not in dispute" and that "there is a substantial public interest in assuring that individuals will not die or suffer substantial injury in an attempt to become members of a fraternity.").

[70]  The Court also notes that applying a more stringent duty of care on Bucknell also runs counter to firmly established public policy rejecting the imposition of an *in loco parentis* duty on colleges and universities.  *See Alumni Ass'n v. Sullivan*, 572 A.2d 1209, 1213 (Pa. 1990) ("Clearly, in modern times, it would be inappropriate to impose an *in loco parentis* duty upon universities.").

## 2.    Restatement

Jean also argues that, even if the Court declines to create a new common-law duty under *Althaus*, Bucknell is nevertheless subject to the standards of care set forth in sections 314A, 344, and 323 of the Restatement (Second) of Torts. "Generally, there is no duty to control the acts of a third party unless the [d]efendant stands in some special relationship with either the person whose conduct needs to be controlled or . . . with the intended victim of the conduct, which gives the intended victim a right of protection."[71]  One such relationship is that "between a business and its invitee."[72]

Section 314A clarifies that the business-invitee relationship is special and thus an exception to the general rule, while section 344 qualifies the exception's scope.[73]  Specifically, section 344 provides that:

> A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to

---

[71] *Reason v. Kathryn's Korner Thrift Shop*, 169 A.3d 96, 102 (Pa. Super. 2017) (alteration in original) (internal quotation marks omitted) (quoting *Paliometros v. Loyola*, 932 A.2d 128, 133 (Pa. Super. 2007)).

[72] *Id.* (citations omitted).

[73] *See Hills v. Bridgeview Little League Ass'n*, 745 N.E.2d 1166, 1187 (Ill. 2000) (recognizing that section 314A incorporates the "special relationship set forth in section 344" governing landowners and invitees; *see also* Restatement (Second) of Torts § 314A ("A possessor of land who holds it open to the public is under a similar duty to members of the public who enter in response to his invitation.").

- 13 -

> (a) discover that such acts are being done or are likely be done, or
>
> (b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it.[74]

To trigger application of section 344's standard of care, two factual predicates must exist. First, the possessor of land must hold his land "open to the public."[75] And second, the possessor must hold his land open for "business purposes."[76] A party will thus not be subject to liability under section 344 if she neither holds her land open nor does so for business purposes.[77]

The Court deems section 344 (and thus section 314A) inapplicable because neither requirement is met. The Iota Chapter fraternity house, while owned by Bucknell, is not "open to the public." Rather, entry to the house is limited to those who live there and their guests. Further, even if the chapter were considered open to the public, it is not evident to the Court what business purpose would have been served. Accordingly, the Court concludes neither section applies or imposes a duty of care on Bucknell.

The Court likewise rejects Jean's arguments based on section 323. Again, as stated above, "in Pennsylvania there is no general duty on a landlord to protect tenants against criminal intrusion."[78] However, a landlord may incur such a duty

---

[74] Restatement (Second) of Torts § 344.
[75] *Id.*
[76] *Id.*
[77] *Id.*
[78] *James v. Duquesne Univ.*, 936 F. Supp. 2d 618, 633-34 (W.D. Pa. 2013).

when she "assumes a duty . . . and so negligently performs that duty that another

suffers damage."[79]  This exception, codified in section 323, states that:

> One who undertakes, gratuitously or for consideration, to
> render services to another which he should recognize as
> necessary for the protection of the other's person or
> things, is subject to liability to the other for physical
> harm resulting from his failure to exercise reasonable
> care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of
> such harm; or
>
> (b) the harm is suffered because of the other's reliance
> upon the undertaking.[80]

Pennsylvania courts' treatment of section 323 can be described as

"restrictive."[81]  Promisees "may not expect more than is offered," meaning that

they may only recover from a party who negligently performs a promise, not one

who makes a promise that is wholly inadequate.[82]  Further, courts have found

parties liable under section 323 only where they have engaged in a specific

undertaking, as opposed to a general promise.[83]  For example, a landlord's offer to

---

[79]  *Feld v. Merriam*, 485 A.2d 742, 746 (Pa. 1984) (citations omitted).

[80]  Restatement (Second) of Torts § 323; *Lackawanna*, 215 A.3d at 14 (noting that Pennsylvania has adopted and incorporated the duty of care set forth in section 323).

[81]  *See James*, 936 F. Supp. 2d at 634 ("Pennsylvania's intermediate courts have heeded the restrictive teachings laid down in *Feld*.").

[82]  *Feld*, 485 A.2d at 747 ("If, for instance, one guard is offered, [a plaintiff] cannot expect the benefits the same quality and type of protection that two guards would have provided, nor may he expect benefits that a different program might have provided.  He can only expect the benefits reasonably expected of the program *as offered* and that that program will be conducted with reasonable care." (emphasis added)).

[83]  *See id.* (comparing cases).

replace a broken lock constitutes a specific undertaking,[84] but a general promise to provide security on the premises does not.[85]

The Court determines that Bucknell's anti-hazing policies do not give rise to a legal duty under section 323.  The Complaint does not discuss these policies at length, although it alleges that Bucknell has acted negligently by failing to "have" and "enforce" appropriate anti-hazing policies.[86]  But case law shows that simply failing to "have" an adequate policy is not sufficient to trigger section 323. Moreover, the Complaint does not allege that Bucknell made more than a general promise to combat hazing on campus.  As a result, the Court cannot hold that Bucknell had a duty of care in this case.

## B.  Hazing and Negligence Per Se

Bucknell next seeks to dismiss counts I and VI of the Complaint asserting claims for "hazing" and negligence per se.  Both claims are predicated on Bucknell's alleged violation of Pennsylvania's anti-hazing statute.[87]  Because the viability of both counts depends on whether Bucknell has actually violated the statute, the Court considers Bucknell's challenges to both together.[88]

---

[84]  *Reider v. Martin*, 519 A.2d 507, 511 (Pa. Super. 1987).

[85]  *Kerns v. Mthodist Hospital*, 574 A.2d 1068, 1078 (Pa. Super. 1990).

[86]  Doc. 1 ¶ 64.

[87]  18 Pa. C.S. § 2801, *et seq.*

[88]  The Court additionally notes that the anti-hazing statute does not explicitly create a private right of action (thus likely precluding Jean's standalone claim for hazing).  However, a party's violation of the statute may still be used, as here, to show negligence per se.

"A plaintiff may satisfy the duty and breach elements of a negligence claim" by showing that the defendant's conduct constitutes negligence per se.[89]  A party is negligent per se when she has "violated a statute 'designed to protect the public harm.'"[90]  To establish negligence per se, a plaintiff must satisfy four criteria:

> (1)   The purpose of the statute must be, at least in part, to protect the interest of a group of individuals, as opposed to the public generally;
>
> (2)   The statute or regulation must clearly apply to the conduct of the defendant;
>
> (3)   The defendant must violate the statute or regulation; and
>
> (4)   The violation of the statute or regulation must be the proximate cause of the plaintiff's injuries.[91]

The parties dispute only the third criteria: whether Bucknell has violated section 2804 of Pennsylvania's anti-hazing statute.  Sections 2802 and 2803 of the statute broadly prohibit hazing by individuals,[92] and section 2804 imposes liability on any organization that "intentionally, knowingly or recklessly promotes or

---

[89]   *Piazza v. Young*, 403 F. Supp. 3d 421, 438 (M.D. Pa. 2019) (quoting *Schemberg v. Smicherko*, 85 A.3d 1071, 1074 (Pa. Super. 2014)).

[90]   *Id.* (quoting *Schemberg*, 85 A.3d at 1074).

[91]   *Schemberg*, 85 A.3d at 1074 (citing *Mahan v. Am-Gard, Inc.*, 841 A.2d 1052, 1058-59 (Pa. Super. 2003)).

[92]   18 Pa. C.S. § 2802.  In relevant part, section 2802 holds that "[a] person commits the offense of hazing if the person intentionally, knowingly or recklessly, for the purpose of initiating, admitting or affiliating a minor or student into or with an organization, for the purpose of continuing or enhancing a minor or student's membership or status in an organization, causes, coerces or forces a minor student to," among other things, violate state or federal law, consume alcohol that puts the minor or student at risk, and endure mental, sexual, or physical brutality. *Id.* § 2802(a).  Section 2803 defines aggravated hazing.  18 Pa. C.S. § 2803(a).

facilitates" a violation of section 2802 or 2803.[93]  The question before the Court is thus whether Bucknell's alleged behavior constitutes an intentional, knowing, or reckless facilitation or promotion of the hazing that Jean experienced.[94]

The Court determines that it does not.  First, Bucknell's asserted conduct did not facilitate or promote any incident of hazing.  Jean does not allege that Bucknell knew about the September 10, 2020 initiation, that Bucknell approved it, or in any way promoted or funded it.  Further, unlike in *Humphries v. Pennsylvania State University*, Jean does not contend that Bucknell actively ignored a plaintiff's reports of hazing in a way that resulted in *future* hazing.[95]  The most that can be said here is that Bucknell has failed to adequately address student alcohol consumption on campus.  But this alone did not facilitate or promote Jean's hazing.

Second, even if the facilitation or promotion element could be established, the Complaint has not alleged facts showing it was intentional, knowing, or reckless.  The only information even suggesting that Bucknell might have had notice that Jean would be hazed by members of the Iota Chapter is an incident occurring over *ten years* before what happened to Jean.  Jean did not report any hazing by the Iota Chapter to Bucknell, nor does he claim that Bucknell was aware

---

[93]  18 Pa. C.S. § 2804(a).
[94]  The Court need not address the level of specificity implicated by section 2804 because the only alleged act of hazing was that which occurred against Jean.
[95]  2020 WL 5878409, at *6.  Even accepting as true that Bucknell has actively attempted to keep the September 10, 2020 incident quiet, this would not constitute a violation of section 2804 because it did not facilitate or promote a *subsequent* incident of hazing.

of hazing that had occurred at the Iota Chapter post-2009.  Thus, on these facts, the Court cannot hold that Jean has stated a claim for negligence per se for violation of section 2804.  Accordingly, Bucknell's motion to dismiss counts I and VI is also granted.

## IV.    CONCLUSION

Bucknell's motion to dismiss pursuant to Rule 12(b)(6) is granted, and Jean is granted leave to amend.

An appropriate Order follows.


BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge